**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

------------------------------------------------------x
3 UNIVERSITY PLAZA SPE, LLC and     :     TAX COURT OF NEW JERSEY
3 UNIV PLZA SPE % NORMANDY RE P,    :     DOCKET NOS.:    005002-2014
                                     :                                     001670-2015
           Plaintiff,             :                                     003553-2016
                                       :                                     001163-2017
v.                                          :                                     003768-2018
                                       :                                     012891-2019
HACKENSACK CITY,                :
                                       :
           Defendant.           :
------------------------------------------------------x

| Approved for Publication |
| In the New Jersey |
| Tax Court Reports |

Decided: February 24, 2022

Michael J. Caccavelli and Grace Chun for plaintiff (Pearlman & Miranda, LLC, attorneys).

Kenneth A. Porro for defendant (Chasan Lamparello Mallon & Cappuzzo, P.C., attorneys).

NOVIN, J.T.C.

This shall constitute the court's opinion following trial of the local property tax appeals filed by plaintiff, 3 University Plaza SPE, LLC/3 Univ. Plza SPE % Normandy RE P ("3 University Plaza").[1] 3 University Plaza challenges the 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments on its improved property located in Hackensack, New Jersey. A core issue in dispute in these matters is whether leasing commissions and tenant improvement allowances should be applied "above-the-line" or "below-the-line" in calculating net operating income.

For the reasons stated more fully below, the court reduces the 2014 and 2015 local property tax assessments. For the 2016, 2017, 2018, and 2019 tax years, the court finds the subject

---

[1] Judge Joseph Andresini, P.J.T.C (retired, on recall) was recused from these matters and did not participate either substantively or procedurally.

property's net operating income, and base capitalization rate to be: (i) $1,943,294; 6.53%, as of October 1, 2015; (ii) $1,943,294; 6.42%, as of October 1, 2016; (iii) $1,943,294; 6.42%, as of October 1, 2017; and (iv) $1,943,294; 6.65%, as of October 1, 2018.[2]

## I.    Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

As of the valuation dates, 3 University Plaza was the owner of the real property and improvements located at 80 University Plaza Drive, Hackensack, Bergen County, New Jersey (the "subject property").[3]   The subject property is identified on Hackensack's ("Hackensack") municipal tax map as Block 500, Lots 97 and 101, and Block 500.02, Lot 2.

The subject property consists of three irregular-shaped lots comprising 14.17-acres. The real property is improved with a six-story, aging Class A, multi-tenanted office building, containing 225,439 square feet of leasable area.[4]  The building was constructed in 1984 of a steel frame and masonry curtain walls with a red-brick exterior, intermixed with six bands of glass windows.[5]  The building's lobby was renovated in 2012.  Building amenities included an atrium

---

[2]  The Director's average ratio of assessed to true value, to be applied for the 2016 through 2019 tax years, was disputed.  Accordingly, during trial the parties requested that the court bifurcate that issue for subsequent court proceedings.  See R. 4:38-2(a).

[3]  In or about April 2019, 3 University Plaza marketed the subject property for sale.  After several rounds of bidding, the subject property was sold on November 6, 2019, for $16,620,000.

[4]  The parties disputed the building's classification.  3 University Plaza's expert opined that the building was more closely aligned with Class B buildings because of its tenant quality and "secondary" location.  Conversely, Hackensack's expert opined that the building is a Class A building.  Based on the photographs, evidence, and testimony elicited during trial, including the marketing brochure and Confidential Offering Memorandum prepared for 3 University Plaza, identifying it as a "Premier Class A office building," the court finds that the building is an aging Class A office building, in need of certain cosmetic enhancements and amenity upgrades.

[5]  The parties stipulated that: (a) the lots comprise 14.17 acres; (b) the structure is a six-story, multi-tenanted office building; and (c) the building contains 225,439 square feet of rentable area.

area, conference center, security guard station, an on-site café/cafeteria, card-key access system, five-passenger elevators, one freight elevator, a loading door, and an outdoor fountain with a seating area. The building is located next to and contains views of the Hackensack River and a walking/jogging path running alongside the Hackensack River. The subject property is close to U.S. Highway Route 4 and is approximately 10 minutes from the George Washington Bridge. Adequate on-site surface parking exists in the lots next to the building.

The property is improved with public and private utilities, including natural gas, electric water, sewer, and telephone. The building is not separately metered for electric. Typically, the subject property's offices are leased on a gross plus tenant electric basis. Thus, each tenant pays the landlord an electric charge based on their leased square footage in addition to rent.

The subject property is located near the intersection of River Street and University Plaza Drive in Hackensack's UN - University zoning district. The permitted uses in that zone include office or office use, colleges, or universities of higher learning (excluding dormitories associated with any college or university), municipal buildings, public parks, public schools and vocational schools, and restaurants. Thus, operation of the subject property as a multi-tenanted office building is a legally conforming use. Due to the subject property's proximity to the Hackensack River, it is in the AE Special Flood Hazard Area, denoting an area "subject to inundation by the 1-percent-annual-chance flood event" and requires flood insurance.[6]

During trial, testimony was elicited from Giorgios L. Vlamis, a former principal of Normandy Real Estate Partners ("Normandy"), the prior owner of 3 University Plaza; Arthur Carlson, Jr., Hackensack's municipal tax assessor; and Ernest "Rick" DelGuercio, Jr., former

---

[6] FEMA, Glossary, Zone AE and A1-30, https://www.fema.gov/glossary/zone-ae-and-a1-30 (last updated July 7, 2020).

President of Appraisal Systems, Inc. ("ASI"), the company charged with conducting Hackensack's reassessment program. In addition, 3 University Plaza and Hackensack each offered testimony from a New Jersey certified general real estate appraiser, who were both accepted by the court, without objection, as experts in the field of real property valuation (the "expert" or "experts"). The experts prepared appraisal reports expressing their opinions of the subject property's true market value as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October 1, 2018 valuation dates.

As of each valuation date, the subject property's tax assessment, implied equalized value, and each expert's value conclusion is set forth below:

| Valuation date | Tax assessment | Director's avg. ratio of assessed to true value[7] | Implied equalized value | 3 University Plaza's expert | Hackensack's expert |
|---|---|---|---|---|---|
| 10/1/2013 | $21,779,700 | 93.86% | $23,204,453 | $14,800,000 | $29,370,000 |
| 10/1/2014 | $21,779,700 | 89.22% | $24,411,231 | $14,800,000 | $29,750,000 |
| 10/1/2015 | $27,716,400 | 100% | TBD[8] | $14,400,000 | $28,980,000 |
| 10/1/2016 | $29,459,200[9] | 92.41% | TBD | $15,400,000 | $29,230,000 |
| 10/1/2017 | $30,407,500[10] | 92.66% | TBD | $15,000,000 | $29,230,000 |
| 10/1/2018 | $31,649,500 | 91.98% | TBD | $15,100,000 | $28,320,000 |

[7] See New Jersey Division of Taxation, Table of Equalized Valuations, https://www.state.nj.us/treasury/taxation/lpt/lptvalue.shtml (last updated Feb. 3, 2022).

[8] The parties dispute the Director's average ratio of assessed to true value to be applied to the court's concluded true value for the 2016, 2017, 2018, and 2019 tax years. Specifically, the parties disagree whether a municipal-wide reassessment, see N.J.A.C. 18:12A-1.14(c), or annual reassessment program, see N.J.A.C. 18:12A-1.14(i), was performed. The Director's 2016 and 2017 Approved Revaluation and Reassessments publications each state that Hackensack implemented a "Reassessment." However, the Director's 2018 and 2019 Approved Revaluation and Reassessments publications each state that Hackensack implemented an "Annual Reassessment." See New Jersey Division of Taxation, Revaluation and Reassessment Approval Lists, https://www.state.nj.us/treasury/taxation/lpt/revaluation.shtml (last updated Mar. 3, 2021).

[9] 3 University Plaza's expert's report misstated the total assessment as $29,439,200.

[10] 3 University Plaza's expert's report misstated the total assessment as $30,307,500.

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the taxpayer's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Ibid. (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). The evidence presented, when viewed under the Brill standard, "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make

5

a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Here, at the close of 3 University Plaza's proofs, Hackensack moved to dismiss these matters under R. 4:37-2(b), arguing that 3 University Plaza failed to overcome the presumption of validity that attaches to the local property tax assessments.[11] According 3 University Plaza all reasonable and legitimate inferences which could be deduced from the evidence presented, the

---

[11] In opposition to the motion, 3 University Plaza argued that no presumption of validity should attach to the local property tax assessments for the 2016, 2017, 2018, and 2019 tax years. 3 University Plaza emphasized that neither Arthur Carlson, Jr. nor Ernest "Rick" DelGuercio, Jr., could offer any meaningful testimony regarding how the market rent, expenses, and capitalization rate information reflected in the reassessment program's Property Valuation/Assessment worksheets were arrived at. Moreover, 3 University Plaza posited that the income capitalization approach utilized in those worksheets seemingly employed an income capitalization approach for net leases rather than an income capitalization approach for gross leases. Thus, because Mr. Carlson relied on the estimated market values contained in those worksheets in determining the subject property's tax assessments for the 2016, 2017, 2018, and 2019 tax years; and because the wrong approach was allegedly used to value the subject property during the reassessment, no presumption of validity should attach. The court found that 3 University Plaza failed to offer credible evidence demonstrating that the subject property's tax assessments for the 2016, 2017, 2018, and 2019 years were arrived at arbitrarily or capriciously or were based on a flawed methodology. The income capitalization approach, employed during the reassessment program on the Property Valuation/Assessment worksheets, is an accepted technique to derive the value of an income-producing property. Although neither Mr. Carlson nor Mr. DelGuercio could detail how the ASI staff appraisers arrived at the market rents, vacancy rates, expenses, or capitalization rates set forth on the Property Valuation/Assessment worksheets, that alone does not render the reassessment program and the local property tax assessments flawed. The court's review of the 2016, 2017, and 2018 reassessment worksheets disclose that ASI attributed a market rent of only $11.00 and $12.00 per square foot, expenses of 12%, and did not load the capitalization rate. However, for the 2019 and 2020 reassessment worksheets, ASI employed market rent of $22.50 per square foot, expenses of 30%, and loaded the capitalization rate with the effective tax rate. Thus, although the subject property operates on a gross lease, plus tenant electric basis, it is possible that ASI valued the subject property for the 2016, 2017, and 2018 tax years on a net basis, making downward adjustments to the market rent to account for the differences between the expenses borne under a net lease and gross lease. Moreover, Mr. Carlson credibly testified that he often questioned representatives of ASI about their calculations and consulted with Hackensack's experts before determining the tax assessments to be imposed.

6

court concluded that 3 University Plaza produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of 3 University Plaza's expert and the facts upon which he relied raised debatable questions regarding the correctness of the subject property's tax assessments for the 2014, 2015, 2016, 2017, 2018, and 2019 years. Accordingly, the court denied Hackensack's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "[t]he court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Pennwalt Corp. v. Twp. of Holmdel, 4 N.J. Tax 51, 55 (1982) (citing Samuel Hird & Sons, Inc. v. Garfield, 87 N.J. Super. 65 (App. Div. 1965)). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 314-15 (1992) (citing Pantasote Co., 100 N.J. at 413).

B. Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack

Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, 3 University Plaza and Hackensack stipulated, and the court agrees, that the highest and best use of the subject property as vacant and as improved, is as a multi-tenanted office building.

C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor St. LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004), aff'd, 23 N.J. Tax 9 (App. Div. 2005) (citing Samuel Hird & Sons, Inc., 87 N.J. Super. at 72); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (internal citation omitted). "The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of N.Y. v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610 (Tax 1985).

Here, 3 University Plaza and Hackensack stipulated, and the court agrees, that the income capitalization approach is the most appropriate method to derive the subject property's estimated true market value.

1.    Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate

benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). See Parkway Vill. Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

a.    Market or Economic Rent

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co., 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal 121-22 (5th ed. 2010). Thus, determining the economic or market rent allows an appraiser to accurately calculate the stream of income generated by a property and convert that benefit into a value.

Here, 3 University Plaza and Hackensack stipulated that the economic or market rent attributable to the subject property for the 2014, 2015, 2016, 2017, 2018, and 2019 tax years is $21.75 per square foot of leasable office area. In addition, 3 University Plaza and Hackensack further stipulated that the tenant electric charges for the 2014, 2015, 2016, 2017, 2018, and 2019 tax years are $1.75 per square foot.

Thus, the subject property's potential gross income from office rents, as of each valuation date, is $4,903,298 (225,439 square feet x $21.75 PSF = $4,903,298). In addition, the income

9

derived from tenant electric charges, as of each valuation date, is $394,518 (225,439 square feet x $1.75 PSF = $394,518).

    b.    <u>Stabilized expenses</u>

Once economic or market rent, potential gross income, and the vacancy and collection loss has been determined, the next step under the income capitalization approach is discerning the stabilized expenses to be applied to the effective gross income.

Here, 3 University Plaza and Hackensack stipulated that the base operating expenses (exclusive of leasing commissions, tenant improvement allowances, management fees, and replacement reserves) should be $7.50 per square foot of leasable office area during all tax years under appeal.

In addition, 3 University Plaza and Hackensack agreed that a management fee of 3% of effective gross income and a reserve for replacements of 1.5% of effective gross income should be applied. However, 3 University Plaza and Hackensack could not agree on how leasing commissions and tenant improvement allowances should be applied.

Thus, the central issues remaining in dispute between the parties are: (i) the vacancy and collection loss factor that should be applied to the subject property's reconstructed potential gross income; (ii) whether the leasing commissions and tenant improvement allowances should be applied "above-the-line" or "below-the-line" in calculating net operating income; (iii) the leasing commission expense and tenant improvement allowance that should be applied; (iv) the capitalization rates that should be applied to the reconstructed net operating income; and (v) whether the subject property's November 9, 2019 sale reflected market value.

10

1. Fact witness testimony

A. Giorgios L. Vlamis

According to Mr. Vlamis, part of Normandy's business model was purchasing the outstanding debt on highly leveraged properties and converting that debt into equity positions.[12] As such, Normandy acquired the title to the subject property after foreclosing on a group of mortgage loans.  Mr. Vlamis was responsible for overseeing the subject property's managing agent, who in turn was responsible for retaining a real estate broker to market the subject property for lease.  According to Mr. Vlamis, the subject property was always a "poor performer" in their suburban office building portfolio.  Despite what he characterized as Normandy's best efforts to stabilize occupancy; it was never able to materially alter the historically high vacancy rates that plagued the subject property.

Mr. Vlamis expressed that the subject property was a "broker friendly" building.  Generally, 3 University Plaza would pay real estate brokers a leasing commission of 5% and an additional "override" leasing commission of 2½% to its listing broker.  Additionally, due to the subject property's operation as a multi-tenanted office building, Mr. Vlamis explained that some leases expired each year, and new leases were always being negotiated, resulting in leasing commissions being incurred on an annual basis.  Moreover, according to Mr. Vlamis, leasing commissions were paid by 3 University Plaza on both new lease agreements and lease renewals.  Mr. Vlamis could not recall any lease transaction where 3 University Plaza paid no leasing commissions.

Finally, Mr. Vlamis testified that to be competitive in the market, 3 University Plaza

---

[12] Normandy Real Estate Partners was the former owner of 3 University Plaza.  In or about 2020, several principals in Normandy Real Estate Partners formed Senlac Ridge Partners and acquired Normandy's suburban office portfolio.

regularly offered new tenants (on new leases) and existing tenants (on lease renewals), an improvement allowance, and a period of free rent. According to Mr. Vlamis, the tenant improvement allowance was generally dictated by the lease term; thus, the longer the lease term, the higher the tenant allowance afforded. In his experience, before existing tenants negotiate a new lease, they survey the market for asking rents, tenant improvement allowances, and periods of free rent to use that information in negotiations.

B. Arthur Carlson, Jr.

According to Mr. Carlson, in 2016, Hackensack implemented a five-year "rolling reassessment" program. As Hackensack's municipal tax assessor, Mr. Carlson was responsible for overseeing the program; however, he was not involved in its day-to-day operations. Rather, the task of gathering property information, market data, identifying the properties to be inspected, and conducting the interior and exterior inspections rested with ASI. Mr. Carlson expressed that, for the 2016 tax year, inspections of 100% of the interior and exterior of all properties in Hackensack were attempted. ASI would chart the inspections attempted and completed monthly, and that data would be submitted to Mr. Carlson and the Bergen County Board of Taxation. However, Mr. Carlson admitted that he was not involved in how ASI arrived at its determination of the estimated value of properties under the reassessment program. Thus, whether ASI employed a sales comparison, income capitalization, or cost approach was solely dictated by ASI. ASI would then submit its estimated property values to Mr. Carlson for review and approval on the tax assessment list.

In Mr. Carlson's opinion, the Hackensack real estate market improved from 2016 to 2019; thus, changes were made during the reassessment program to the subject property's tax assessment to account for those perceived changes in market value. However, after discussions with the

subject property's new legal counsel, ASI's appraisers, and Hackensack's expert, Mr. Carlson testified that he reduced the subject property's 2020 tax year assessment (a tax year not involved in the trial). According to Mr. Carlson, the office building market was "coming down" between 2019 and 2020, and the subject property's assessment was "too high." Therefore, in 2019, Hackensack commissioned its expert to prepare an appraisal report for the subject property to assist him in determining the subject property's 2020 local property tax assessment.

### C. Ernest "Rick" DelGuercio, Jr.

Mr. DelGuercio was the former President of ASI, the firm charged with responsibility for undertaking Hackensack's reassessment programs from 2016 through 2020. According to Mr. DelGuercio, Hackensack contracted with ASI to undertake a reassessment of all property in Hackensack, under the supervision of Mr. Carlson.[13] In Mr. DelGuercio's opinion, a full or municipal-wide reassessment was performed by ASI for Hackensack for the 2016 through 2020 tax years.

However, evidence introduced during trial demonstrated that a Form AFR—Application for Full Reassessment—was completed and submitted by Hackensack to the Director, New Jersey Division of Taxation, and the Bergen County Board of Taxation, only for the 2016 tax year. See N.J.A.C. 18:12A-1.14(c). The trial record further revealed that for the 2017 through 2020 tax years, Hackensack submitted a Form AFR-A, Application for Annual Reassessment. See N.J.A.C. 18:12A-1.14(i). Although similarities exist between the two programs, the requirements for a full or municipal-wide reassessment program, under N.J.A.C. 18:12A-1.14(c), and an annual reassessment program, under N.J.A.C. 18:12A-1.14(i), are different. See Tartivita v. Union Beach

---

[13] According to Mr. DelGuercio, the ASI appraiser chiefly responsible for investigating and conducting the reassessment of the commercial properties in Hackensack, Ms. Sheppard, is no longer associated with ASI. Ms. Sheppard was not called as a witness during trial.

Borough, 31 N.J. Tax 335 (Tax 2019), aff'd, 2021 N.J. Super. Unpub. LEXIS 1022 (App. Div. 2021)[14]; Pella Realty, LLC v. Paterson City, 31 N.J. Tax 474 (Tax 2020).

Nonetheless, Mr. DelGuercio offered that for the 2016 tax year, interior inspections of 100% of the properties were attempted, exterior inspections of 100% of the properties were conducted, and all line items on Hackensack's tax roll were reviewed and changed. For the 2017 through 2020 tax years, interior inspections of only 25% of the properties were attempted each year, but exterior inspections of 100% of the properties were conducted. Moreover, Mr. DelGuercio submitted that for the 2017 through 2020 tax years, all line items on Hackensack's tax roll were reviewed and changed.[15]

### 2. Expert witness testimony

3 University Plaza's expert and Hackensack's expert each inspected the subject property. Their respective appraisal reports include photographs, the subject property's leasing and vacancy history, multi-tenanted office vacancy data and lease information in the subject property's competitive market area, tenant improvement allowance information, comparable expense data from the marketplace, and capitalization rate information.

### A. Vacancy and collection loss

Both experts examined the subject property's historical vacancy rates, along with the published surveys of vacancy rates from commercial real estate data collection firms, including Real Estate Information Services ("REIS") and CoStar ("CoStar").

---

[14] Approved for publication in the New Jersey Tax Court Reporter.
[15] According to Mr. DelGuercio, each line item was analyzed every year, and each property record card was updated. However, no testimony or evidence was elicited with respect to what that analysis encompassed or detailing how, and by whom, it was performed, and whether a significant, substantial, and meaningful change in the aggregate assessed valuations of all properties in Hackensack from one year to the following year was effectuated. See Ennis v. Alexandra Twp., 13 N.J. Tax 423, 426-27 (Tax 1993).

In 3 University Plaza's expert's opinion, the subject property experienced vacancy rates higher than the marketplace. 3 University Plaza's expert's review of the subject property's operational history disclosed vacancy rates from 2013 through 2018 ranging from 22.77% to 39.31%, with a mean of 32.06%. Conversely, the REIS Office Market Report disclosed that the vacancy rates of Class A, B, and C office buildings in the Hackensack/Teaneck office submarket from 2013 through 2018 ranged from 16% to 19.4%, with a mean of 18.15%.[16] In addition, the REIS Office Market Report further revealed that vacancy rates for Class A office buildings in the Hackensack/Teaneck office submarket ranged from 15.5% to 19.9%, with a mean of 18.21%.

3 University Plaza's expert also reviewed absorption rates for Class A, B, and C office buildings in the subject property's submarket. His data review disclosed that net absorption rates were negative in 2015 (reflecting a weakening market) and positive in 2013, 2014, 2016, 2017, and 2018 (reflecting an improving market).

3 University Plaza's expert testified that he also relied on CoStar Office Reports for the Hackensack submarket in determining his vacancy and collection loss rates. According to 3 University Plaza's expert, the CoStar Office Reports for the Hackensack submarket revealed vacancy rates ranging from 9% to 13.9% for all classes of office buildings, and an overall positive absorption rate, during all tax years at issue.

3 University Plaza's expert used the CoStar Office Reports to identify a "Peer Group (Competitive Set)" of Class A multi-tenanted office buildings in the Hackensack submarket adjacent to the subject property, including Continental Plaza I, II, and III; Court Plaza North and South; and 1 University Plaza and 2 University Plaza. According to 3 University Plaza's expert,

---

[16] The Hackensack/Teaneck submarket apparently includes Hackensack, Saddle Brook, Garfield, Maywood, Teaneck, Bergenfield, Elmwood Park, Lodi, Hasbrouck Heights, South Hackensack, and Rochelle Park.

15

the vacancy rates for those competitive buildings ranged from 0% to 32.7%, with an overall vacancy average rate of 15.3% to 21.2%. After reviewing the foregoing vacancy and absorption information, 3 University Plaza's expert opined that a 17.5% vacancy and collection loss allowance should be applied to the subject property's potential gross income.

In Hackensack's expert's opinion, the subject property's high vacancy rates are attributable to its 2012 foreclosure sale and subsequent poor management by 3 University Plaza. As evidence of this alleged mismanagement, Hackensack emphasized that the 2019 marketing material, offering the subject property for sale, stated that the subject property offered a "value add opportunity," with the ability to increase the "NOI by $1,000,000" by making upgrades and "leasing of the available space." Moreover, Hackensack's expert submitted that based on his discussions with several of the subject property's current and former tenants, management was not responsive to their requests to clean, repair, and renovate its facilities.

Relying on CoStar Northern New Jersey Office Market Reports for the Bergen East submarket, Hackensack's expert analyzed all building classes' vacancy and absorption rates. His review of the data disclosed vacancy rates ranging from 9.5% to 14.6% during all tax years at issue. Moreover, he found that overall absorption was positive in 2014, 2015, and 2016 and negative in 2017. Accordingly, Hackensack's expert opined that a 10% vacancy and collection loss factor should be applied to the subject property's potential gross income.[17]

Although the REIS Office Market Reports and CoStar Northern New Jersey Office Market

---

[17] Hackensack's expert submitted that his February 2021 CoStar Office Report is evidence that the subject property was mismanaged because of the subject property's aggressive leasing activity following the sale. However, it is possible that the subject property's new owner offered steep discounts on rent or extraordinary tenant improvements allowances to attract new tenants to the building and reduce vacancy. Moreover, the court's review of the data discloses that the average vacancy rate of the eight multi-tenanted office buildings surveyed for the preceding twelve-month period was 14.76%.

16

Reports are insightful, neither report generates the vacancy rates of Class A Office buildings only in Hackensack. The REIS Office Market Report distinguishes between Class A and Class B and C office buildings; however, it includes competitive markets outside Hackensack. In addition, the CoStar Northern New Jersey Office Market Reports fail to distinguish the vacancy rates by building class and include markets outside of Hackensack.

Here, the subject property is a Class A multi-tenanted office building in Hackensack. Therefore, the court finds that vacancy data of other similarly situated Class A multi-tenanted office buildings competitively located to the subject property are the most compelling evidence of vacancy rates in the subject property's market. 3 University Plaza's expert identified seven buildings in his Peer Group that satisfy those parameters. Moreover, Hackensack's expert acknowledged that the Peer Group office buildings are the subject property's competitors in the marketplace.[18] The court's independent review and analysis of the forty-two quarterly reported vacancy rates, from 2013 through 2018, of the seven Peer Group office buildings, disclosed that the buildings experienced vacancy rates from 0% to 30.9%, with a mean vacancy rate of 15.09%, and a median vacancy rate of 13.65%, over those quarters.

Therefore, after considering the testimony and data presented, the court finds that the evidence supports a 14% vacancy and collection loss factor. Accordingly, the court will apply the 14% vacancy and collection loss factor to all tax years at issue.

---

[18] Hackensack argues the subject property was mismanaged, and due to the mismanagement, it experienced higher vacancy rates than the office buildings identified by 3 University Plaza's expert in the Peer Group. However, the court cannot conclusively say whether the root cause for the higher vacancy rates was attributable to poor management, the subject property's 2012 foreclosure sale, the need for alleged cosmetic enhancements, the subject property's attractiveness in the marketplace, or a host of other potential factors.

B.    Below-the-line/above-the-line

Although the experts agreed on how the subject property's potential gross income and effective gross income should be calculated under the reconstructed operating statements, the experts differed on what constitutes a stabilized operating expense and whether certain expenses should be deducted from effective gross income in calculating net operating income.[19]

In 3 University Plaza's expert's opinion, tenant improvement allowances and leasing commissions are an annually reoccurring and ordinary business expense of owners of multi-tenanted office buildings in the marketplace. Based on his familiarity and analysis of the market, 3 University Plaza's expert concluded that landlords must afford prospective and renewal tenants an improvement allowance to entice them to sign a new lease or renew their existing leases. Moreover, he found that to effectively market and promote space for lease to prospective tenants and retain maximum occupancy, landlords must engage real estate brokers and pay them market-rate commissions amounting to a percentage of the initial lease term rent and the renewal lease term rent. According to 3 University Plaza's expert, the building owner "has to write a check for every single year [for] tenant improvement allowance and commissions. These are [a] reoccurring expense, and very typical of multi-tenanted office buildings within this marketplace . . . you're going to have reoccurring tenants that are going to be leaving, new tenants are going to be occupying the space, tenants are going to be renewing their leases. And [in] all of those situations,

---

[19]  First, both experts multiplied the stipulated economic or market rent ($21.75 per square foot) and tenant electric charges ($1.75 per square foot) by the subject property's leasable area (225,439 square feet) to compute potential gross income. Next, both experts deducted a vacancy and collection loss factor from the potential gross income to discern the subject property's effective gross income. Finally, both experts agreed that stipulated base operating expenses ($7.50 per square foot), management fees (3% of effective gross income), and reserves for replacements (1.5% of effective gross income) should be deducted from effective gross income in determining net operating income.

there's going to be a tenant improvement allowance that's a reoccurring expense to ownership." Therefore, he opined that a stabilized tenant improvement allowance and leasing commission expense should be deducted from the subject property's effective gross income in determining net operating income. In sum, 3 University Plaza's expert considered tenant improvement allowances and leasing commissions an "above-the-line" expense.

Conversely, in computing the subject property's net operating income, Hackensack's expert did not deduct a stabilized tenant improvement allowance and leasing commission expense. In his opinion, tenant improvement allowances and leasing commissions should be treated as "below-the-line expenses" and only considered in developing the capitalization rate. Hackensack contends that deducting tenant improvement allowances and leasing commission expenses from net operating income amounts to valuing the subject property's cash flow and represents a discounted cash flow analysis, an improper valuation method for local property tax purposes.[20] According to Hackensack, a building owner lacks the ability to reasonably foresee or routinely forecast the events that would result in it annually incurring tenant improvement allowances and leasing commission expenses. Thus, Hackensack maintains that these expenses are distinct and different from predictable stabilized expenses for insurance, utilities, landscaping, and janitorial services.

An "above-the-line expense" is an operating expense "recorded 'above' the net operating income line in a reconstructed operating statement typically developed for valuation purposes and

---

[20] The discounted cash flow ("DCF") method, under the income capitalization approach, is "an assumption-laden approach to estimating the present value of future benefits. It presupposes a measure of reliability in the projection of cash flows over a significant span of years. It also assumes the reasonable accuracy of vacancy rates, expenses, the discounted value of the reversion at the end of the projection period, the capitalization rate applied to the reversion in the first instance[,] and, finally, the discount rate assigned both to the cash flow projections and the reversion." Univ. Plaza Realty Corp. v. Hackensack City, 12 N.J. Tax 354, 366-67 (Tax 1992).

therefore is considered part of the total operating expenses for the property." The Appraisal of Real Estate, at 475. Conversely, a "below-the-line expense" is an expense "recorded 'below' the net operating income line in a reconstructed operating statement and therefore . . . not considered part of the total stabilized operating expense for the property." Ibid.

This court has observed that for property valuation purposes, no globally accepted practice has been adopted for handling tenant improvement allowances and leasing commissions under reconstructed operating statements.[21] However, neither 3 University Plaza nor Hackensack have offered any legal precedent endorsing the view that tenant improvement allowances and leasing commission expenses must be characterized as either "above-the-line" or "below-the-line" expenses.[22] In Martindale Hubbell, Inc. this court concluded that the decision to include, or exclude, tenant improvement allowances and leasing commissions as stabilized operating expenses when calculating net operating income, is a function of the market, context, and the intended use of the appraisal report. The Minnesota Supreme Court similarly expressed, whether tenant improvement allowances and leasing commissions "should be deducted from market rents to arrive at effective market rents 'must be determined on a case-by-case basis' as part of the

---

[21] See Martindale Hubbell, Inc. v. New Providence Borough, 2018 N.J. Tax Unpub. LEXIS 44 (Tax 2018). Both parties rely on the court's unpublished opinion in support of their respective arguments. However, "no unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3.

[22] Generally, in New Jersey, tenant improvement allowances and leasing commissions have been treated as "above-the-line" expenses in computing net operating income. See Litton Bus. Systems, Inc. v. Morris Plains Borough, 8 N.J. Tax 520 (1986); River Office Equities v. Twp. of Middletown, 11 N.J. Tax 404 (Tax 1990); Morris Twp. v. LF Assocs., 12 N.J. Tax 87, 103 n. 7 (Tax 1991); Hull Junction Holding Corp., 16 N.J. Tax at 68; Pine Plaza Assocs., L.L.C. v. Hanover Twp., 16 N.J. Tax 194, 199 (Tax 1996); First Republic Corp. of Am. v. East Brunswick Borough, 16 N.J. Tax 568 (Tax 1997); American Cyanamid Co. v. Wayne Twp., 17 N.J. Tax 542 (Tax 1998); TD Bank v. City of Hackensack, 28 N.J. Tax 363 (Tax 2015). But cf. RTC Props. v. Kearny Town, 13 N.J. Tax 146, 156 (Tax 1993) (rejecting the deduction of tenant improvement expenses for an industrial building as being "capital in nature.")

overall determination of market rents." 444 Lafayette, LLC v. Cty. of Ramsey, 830 N.W.2d 25, 30 (Minn. 2013) (quoting Eden Prarie Mall, LLC v. Cty. of Hennepin, 797 N.W. 2d 186, 196 (Minn. 2011)).

Proponents of the "above-the-line" approach maintain that accounting for tenant improvement allowances and leasing commissions against net operating income allows a property owner to annually account for the expenses necessary to maintain the optimal rental status of a property.

In Matter of Reckson Operating P'ship v. Assessor of Town of Greenburgh, 784 N.Y.S. 2d 923 (Sup. Ct. 2004), the Court concluded that tenant improvement costs should "be treated as an 'above the line expense – [because] [t]enant improvement costs are a recognized expense for space being re-tenanted in a building . . . [o]n a stabilized basis over the course of an investment an owner would recognize the need to fund tenant work and meet these expenditures when they arise." Ibid.

Similarly, in Matter of VGR Assocs. LLC v. Assessor Bd. of Assessment Review of the Town of New Windsor, 831 N.Y.S. 2d 351 (Sup. Ct. 2006), the Court expressed the view that because the "replacement of long-term items and leasing commissions will be incurred in the normal course of business, these are legitimate expenses to be anticipated by the reasonable investor," and therefore, should be reflected as a stabilized, "above-the-line" operating expense. Ibid.

Conversely, advocates of the "below-the-line" method maintain that items like reserves and tenant improvement allowances are capital expenditures that extend the life of the property. Therefore, they contend that those expenditures should not be accounted for in calculating a property's net operating income but rather should be considered in determining the appropriate capitalization rate to be applied.

To illustrate how tenant improvement allowances and leasing commissions can impact a transaction's reported capitalization rate, assume that a Class A multi-tenanted office building recently sold for $30,000,000. Rate 1 derives a capitalization rate employing the "above-the-line" approach or a rate based on the property's net operating income <u>after</u> deducting tenant improvement allowances and leasing commissions. Rate 2 derives a capitalization rate employing the "below-the-line" approach or a rate based on a property's net operating income <u>before</u> accounting for tenant improvement allowances and leasing commissions.

| | |
|---|---|
| Potential gross income | $5,250,000 |
| <u>Less: vacancy & collection loss @ 15%</u> | <u>$   787,500</u> |
| Effective gross income | $4,462,500 |
| | |
| Base operating expenses | $1,800,000 |
| <u>Management fee & repl. reserves</u> | <u>$   225,000</u> |
| Total:  Operating expenses | $2,025,000 |
| | |
| <u>Net Operating Income ("below-the-line")</u> | <u>$2,437,500</u> = 8.125% Cap. - Rate 2[23] |
| Less:   Tenant improvement allowances | |
|     <u>and leasing commissions</u> | <u>$  700,000</u> |
| Net Operating Income ("above-the-line") | $1,737,500 = 5.79% Cap. - Rate 1[24] |

Thus, if tenant improvement allowances and leasing commissions are considered "above-the-line" operating expenses, the transaction's reported capitalization rate would be 5.79%. Conversely, if tenant improvement allowances and leasing commissions are considered "below-the-line" adjustments and not deducted as stabilized expenses, the transaction's reported capitalization rate would be 8.125%.

In support of its position, Hackensack relies on the definition of "below-the-line" expense in the Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u> (6th ed. 2015), stating that

---

[23]  Computed as follows: $2,437,500 (NOI) / $30,000,000 (Purchase Price) = 0.08125 or 8.125%.
[24]  Computed as follows: $1,737,500 (NOI) / $30,000,000 (Purchase Price) = 0.0579 or 5.79%.

"[t]enant improvements and leasing commissions are the most common line items recorded below the net operating income line for analytical purposes." Further, Hackensack emphasizes that the Appraisal Institute, The Valuation of Office Properties, 81 (2009), explains that "leasing expenses and capital costs are typically deducted after the net operating income to arrive at a cash flow before debt service," using a discounted cash flow analysis.

However, Hackensack disregards statements contained within the body of the same text, reciting that "[d]epending on market conditions, the landlord may be obligated to provide a tenant improvement allowance in order to entice prospective tenants to sign a lease and occupy the space." Id. at 80 (emphasis added). Thus, how tenant improvement allowances and leasing commissions should be characterized and applied under a reconstructed operating statement must be based on an appraiser's evaluation and analysis of market conditions. Suppose the appraiser's examination dictates that certain expenditures, such as leasing commissions and tenant improvement allowances, are required by the property owner to compete in the marketplace, to maintain a stabilized occupancy, to attract new tenants to a building, or to entice existing tenants to remain in the building. In that case, the expenditures may properly be characterized as operating expenses. As set forth in The Valuation of Office Properties, at 81, "[a]n expenditure that maintains value is considered an operating expense," and may be deducted as a stabilized expense from effective gross income.

Operating expenses must be stabilized in determining the true or fair market value of a property for local property tax assessment purposes. Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of Am. v. East Newark Borough, 16 N.J. Tax 568, 579 (Tax 1997) (citing The Dictionary

of Real Estate Appraisal 344-45 (3rd ed. 1993)). Consistent with this principle, under the income capitalization approach, the appraiser must perform a "comprehensive analysis of the annual expenses" of the property being appraised and the marketplace. The Appraisal of Real Estate, at 453. "It is . . . an appraiser's function . . . to reconstruct a yearly pattern of expenses . . . Expenses vary from year to year, and it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical." Parkway Village Apartments Co., 8 N.J. Tax at 444. It is only through a detailed examination and analysis of a property's historical income and expenses when measured against necessary expenditures of comparable properties in the marketplace that an appraiser can discern the property's performance over its economic life.

However, no static rule can be applied when determining whether certain conditions are temporary or will exist over a property's economic life. An appraiser must consider each project on a case-by-case basis and analyze the property's historical income and expenses against marketplace norms. In fashioning a reconstructed operating statement, an appraiser should rely on marketplace standards and the income and expenses that are reasonable and necessary for proper operation of the property, including expenses that will reasonably continue over a property's economic life. Moreover, an appraiser should reject income and expenses that may be irregular, erratic, uncharacteristic, and not typical in the marketplace or industry. See Equitable Life Assur. Soc'y of U.S. v. Secaucus Twp., 16 N.J. Tax 463, 467 (App. Div. 1996).

Here, the court finds that 3 University Plaza's expert's deduction of leasing commission expenses and tenant improvement allowances from effective gross income does not amount to a discounted cash flow analysis. 3 University Plaza's expert did not forecast the subject property's income, vacancy rates, and expenses over a delineated holding period. Moreover, he did not apply

24

a discount rate to the subject property's anticipated or future rents nor determine the subject property's residual value after a delineated holding period.[25]  See Univ. Plaza Realty Corp. v. Hackensack City, 12 N.J. Tax 366-68; Hull Junction Holding Corp., 16 N.J. Tax at 81-83.  Rather, based on his analysis of the subject property's historical operations, his investigation of the marketplace, and his inquiries and discussions with property owners and real estate brokers regularly engaged in the multi-tenanted office building marketplace, 3 University Plaza's expert determined that tenant improvement allowances and leasing commission expenses are a customary, recurring, and ordinary expense in the subject property's market.[26]  Therefore, he concluded that tenant improvement allowances and leasing commission expenses are a necessary expense to maintain stabilized occupancy in a multi-tenanted office building, and to retain a property's value in the marketplace.  As such, his inclusion of tenant improvement allowances and leasing commissions as a stabilized operating expense on the reconstructed operating statement was reasonable and supported by the evidence.

However, the court cautions that the choice of evaluating and adjusting tenant improvement allowances and leasing commission expenses must be gauged on a case-by-case basis, grounded in an appraiser's scrutiny of the marketplace.  For example, when a market dictates that tenant improvement allowances and leasing commissions are a necessary expense to achieve stabilized occupancy and retain a property's value in the market, it is appropriate to stabilize those expenses and deduct them from effective gross income.  Conversely, if the appraiser's marketplace analysis

---

[25]  A discount rate is a "yield rate used to convert future payments or receipts into present value . . . a synonym for yield rate."  The Dictionary of Real Estate Appraisal at 59.
[26]  In addition, 3 University Plaza's expert's survey of three market participants in the marketplace disclosed their opinion that there were "[n]o major changes in tenant improvement allowances, leasing commissions, renewal probability, or lease terms for the overall Northern New Jersey market since the mid 2000's."

reveals that tenant improvement allowances and leasing commissions are transitory or an anomaly, then treating them as "above-the-line" expenses that reduce a property's net operating income may be inappropriate.

Accordingly, an appraiser's blind reliance on a single data source or application of a generic, one-size-fits-all formula to calculate a property's net operating income, without an adequate understanding of the marketplace, can lead to artificially inflated or deflated values. As stated in Appraisal Institute, The Appraisal of Real Estate, 466 (15th ed. 2020), when developing a capitalization rate, published surveys are an adequate source of "support rather than as primary evidence of a capitalization rate."

In sum, for local property tax valuation purposes, a thorough analysis of a property's historical operations, the marketplace, and available capitalization rate data is necessary to gauge whether leasing commissions and tenant improvement allowances should be deducted as an "above-the-line" expense or factored into the capitalization rate as a "below-the-line" expense. However, there must be an internal consistency between the manner that such expenses have been deducted and the marketplace, including any capitalization rate data relied on, to ensure an accurate determination of true or fair market value. As Justice Burling keenly observed, "mathematical calculations in appraisals, though made in the best of faith, can lead to divergent results and should be closely scrutinized." Aetna Life Ins. Co., 10 N.J. at 106 (citing Kearny v. Div. of Tax Appeals, 137 N.J.L. 634 (Sup. Ct. 1948)).

C.    Leasing commissions

In 3 University Plaza's expert's opinion, based on his twenty-seven years of experience as an appraiser and association with a real estate brokerage firm, "an allowance for real estate commissions is . . . appropriate in order to secure and maintain tenant occupancy." Accordingly,

in determining his leasing commission expense, 3 University Plaza's expert reviewed the subject property's leases, revealing that "a typical lease commission over the lease period was approximately six percent." Further, based on his examination of the subject property's renewal leases, "[i]n every situation, some amount of commission was paid." In addition, in 2012 and 2014, 3 University Plaza's expert's firm surveyed three market participants of Class A and Class B office buildings. Based on his review of the survey data, leasing commissions ranged from 5% to 7%, on new and renewal lease transactions, with typical lease terms for Class A office buildings averaging between five to ten years. Finally, 3 University Plaza's expert communicated with the subject property's former leasing broker, who relayed that a 5% plus a 2% override commission is common in the subject property's market. Accordingly, 3 University Plaza's expert opined that a stabilized leasing commission expense of 5% of effective gross income is appropriate.

Hackensack's expert opined that leasing commission expenses should be considered a "below-the-line" expense. In his opinion, leasing commissions are not an annual expense incurred by landlords, so they should not be stabilized as an operating expense. He arrived at this conclusion based on his review of the survey data to support his derived capitalization rate. According to Hackensack's expert, PriceWaterhouseCoopers' Real Estate Investor Survey ("PwC"), treats leasing commissions "like we did, . . . you're going to want to do the methodology that is done in the publication that you're relying on, and that is why we treated leasing commissions . . . below-the-line." Other than this testimony, Hackensack's expert offered little meaningful insight or information regarding leasing commission rates on new or renewal leases in the subject property's marketplace.

Based on the trial record, the court concludes that 3 University Plaza's expert's analysis of the subject property's operation and the competitive market supports the deduction of leasing

27

commissions as an "above-the-line" stabilized expense on a reconstructed operating statement. Accordingly, the court finds that the evidence supports a leasing commission expense of 5% of effective gross income.

D.     Tenant improvement allowance

"In certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement allowances. The cost of the tenant improvement allowance is often built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, 474 (14th ed. 2013).

Here, 3 University Plaza's expert opined that tenant improvement allowances "are [a] recurring expense" and are "very typical of multi-tenanted office buildings within the marketplace." When leases mature, existing tenants will either renew their leases or vacate, and new tenants will occupy those vacated spaces, in "those situations, there's going to be a tenant improvement allowance that's a reoccurring expense to ownership." Thus, 3 University Plaza's expert considered tenant improvement allowances an "above-the-line" expense and deducted a stabilized tenant improvement allowance from the subject property's effective gross income.

3 University Plaza's expert explained that in computing his tenant improvement allowance, he examined the subject property's new and renewal leases; new and renewal leases in eighteen comparable properties; conferred with market participants, including the plaintiff; and examined survey data promulgated by PwC of the National CBD (Commercial Business District) Office Market and National Suburban Office Market. That analysis disclosed tenant improvement

28

allowances: (i) on new leases ranged from $0.00 to $100.00, per square foot, with an average range of $31.25 to $49.64, during the tax years at issue; and (ii) on renewal leases ranged from $0.00 to $40.00, per square foot, with an average range of $12.28 to $20.00, during the tax years at issue. Accordingly, 3 University Plaza's expert concluded a tenant improvement allowance for new leases of $20.00 per square foot and renewal leases of $10.00 per square foot.  Moreover, his analysis of the eighteen comparable leases and discussions with market participants disclosed a lease term range from 3 to 10 years, with an average of 5.8 years.  Therefore, he assumed an average lease term of 5 years.

Next, because a combination of new and existing tenants each receive improvement allowances, 3 University Plaza's expert endeavored to ascertain the probability of lease renewals in the marketplace.  He examined PwC surveys of the National CBD Office Market and National Suburban Office Market disclosing a renewal probability range from 40% to 85%, with a mean of 63% to 69%, during all tax years at issue.  Accordingly, 3 University Plaza's expert assumed a 30% renewal probability for new leases and a 70% renewal probability for existing leases.

3 University Plaza's expert then multiplied his concluded tenant improvement allowance by the renewal probability to determine a weighted average and divided that weighted average by his concluded average lease term to determine a stabilized annual tenant improvement allowance. 3 University Plaza's expert's calculation is as follows:

| Lease type | TI Allowance | Renewal probability | Weighted average | Avg. lease term | Stabilized allowance |
|---|---|---|---|---|---|
| New | $20.00 PSF | 30% | $6.00 PSF | 5 years | $1.20 PSF |
| Renewal | $10.00 PSF | 70% | $7.00 PSF | 5 years | $1.40 PSF |
| | | | | TOTAL | $2.60 PSF |

3 University Plaza's expert then applied his concluded $2.60 per square foot stabilized allowance to the subject property's 225,439 square feet of leasable area to compute a stabilized

29

tenant improvement allowance of $586,141 (225,439 x $2.60 PSF = $586,141), that he applied to the subject property's effective gross income during each year under appeal.

Conversely, Hackensack's expert opined that "tenant improvements could be all over the place . . . you're going to have some suites where you're going to be spending money every five years and you have other suites that are going to be there for twenty years . . . without the landlord spending any money on the suite." According to Hackensack's expert, "it's our view that . . . most landlords view [tenant improvement allowances] as a below-the-line [expense], which we saw in . . . the accounting forms and the addenda from . . . Normandy, along with the publication disclosing that most participants don't treat them above-the-line as well." Thus, since Hackensack's expert relied on the PwC survey data in support of his capitalization rates, and because a majority of the PwC survey participants allegedly did not treat tenant improvement allowances as an operating expense, he did not deduct them on his reconstructed operating statement. Other than that testimony, Hackensack's expert offered little meaningful testimony to the court regarding tenant improvement allowances in the subject property's marketplace, the likelihood of lease renewals, or the average term of a new or renewal lease.

Here, based on the trial record, the court finds 3 University Plaza's expert decision to deduct tenant improvement allowances as an annual reoccurring operating expense is reasonable and supported by the evidence. However, the court finds that 3 University Plaza's expert's use of a 5-year "assumed [lease] term" is disparate from the data and the 5.8-year average lease term identified in his appraisal report. Based on the court's analysis of the subject property's twelve new leases executed from 2013 through 2019, the average lease term for a new lease was 6.8 years. In addition, the subject property's Confidential Offering Memorandum states that there is a "weighted average remaining lease term of 6+ years [for the existing 19 tenants]." Moreover, the

30

court's review of the twenty comparable leases identified in Hackensack's expert's appraisal report disclosed that the average lease term was 6.3 years. Accordingly, in determining the stabilized annual expense for tenant improvement allowances, the court will employ a 6-year average lease term resulting in a $2.17 per square foot annual operating expense ($13.00 / 6 years = $2.17).

### E. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Prudential Ins. Co. of Am. v. Parsippany-Troy Hills Twp., 16 N.J. Tax 58, 60 (Tax 1995), aff'd, 16 N.J. Tax 148 (App. Div. 1996); Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, in deriving their capitalization rates, 3 University Plaza's expert and Hackensack's expert employed the Band of Investment technique and reviewed published data, including investor surveys.[27] The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

3 University Plaza's expert reviewed ACLI Commercial Mortgage Commitment tables

---

[27] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . [PwC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

("ACLI") and RealtyRates.com investor surveys to gauge interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates. In addition, he analyzed and reviewed capitalization rate data published by SITUS - Real Estate Research Corporation's ("RERC") and PwC.

Hackensack's expert similarly employed the ACLI tables to derive his mortgage interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates under the Band of Investment technique. Hackensack's expert also engaged in "discussions with local lenders . . ." and investors in the community.[28] Hackensack's expert further offered that he reviewed "alternative investment rates," such as the "Economic Indicators," published by The Appraisal Institute, and "alternative investment opportunities" contained in the PwC investor surveys. According to Hackensack's expert, he examined investor survey responses from PwC to corroborate his concluded capitalization rates.[29]

The following chart details the Band of Investment components and the concluded capitalization rates of the experts:

|  | 10/1/2013 | 10/1/2014 | 10/1/2015 | 10/1/2016 | 10/1/2017 | 10/1/2018 |
|---|---|---|---|---|---|---|
| 3 University Plaza's expert | Int.: 4.0%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 11%<br>CAP: 8.25% | Int.: 4.0%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 11%<br>CAP: 8.25% | Int.: 4.0%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 11%<br>CAP: 8.25% | Int.: 3.5%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 10%<br>CAP: 7.50% | Int.: 3.75%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 10%<br>CAP: 7.75% | Int.: 4.0%<br>LTV: 60%<br>Amort.: 25 yr<br>Eq. div.: 10%<br>CAP: 7.75% |
| Hackensack's expert | Int.: 4.25%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.63% | Int.: 4.0%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.50% | Int.: 4.0%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.50% | Int.: 3.75%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.38% | Int.: 3.75%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.38% | Int.: 4.50%<br>LTV: 75%<br>Amort.: 25 yr<br>Eq. div.: 7%<br>CAP: 6.75% |

---

[28] Hackensack's expert offered that Robert McNerney, MAI, a co-author of Hackensack's appraisal report in these matters, "is on the board of directors of a regional bank . . ." and "formerly was on the board of directors" of a local bank. However, the extent to which Mr. McNerney's position offered meaningful insight into interest rates, loan-to-value ratios, and loan amortization terms for Class A multi-tenanted buildings in the subject property's market was unclear. In addition, Hackensack's expert could not identify any of the investors he consulted.

[29] During trial, Hackensack's expert identified a 2016 Situs RERC report claiming that it supports his conclusion that leasing commissions and tenant improvement allowances should be "below-the-line" expenses but stated that "we did not rely on RERC . . . ."

The court notes that the 25-year loan amortization term employed by the experts for all years under appeal are identical. Moreover, the interest rates employed by the experts as of the October 1, 2014, October 1, 2015, and October 1, 2017 valuation dates are also identical. Finally, the court highlights that the interest rates employed by the experts as of the October 1, 2013 and October 1, 2016 valuation dates do not vary by more than 0.25%.

At the outset, the court emphasizes that the PwC investor surveys and the capitalization rate information contained therein that influenced Hackensack's expert's decision on how the reconstructed operating statement should be assembled are not based on actual sale transactions. Rather, they represent the opinions of investors, in national and select regional markets, regarding their investment expectations for hypothetical transactions. During cross-examination Hackensack's expert readily acknowledged that the survey participants are "not looking at a real building. It's – you know, what they would" be willing to pay for a theoretical investment office building.

In Hackensack's expert opinion, the survey participants are generally insurance companies, pension funds, and other sophisticated high-wealth equity investors. Although Hackensack's expert believes instructions are provided to the survey participants on how to complete it, he admitted that he possessed no familiarity with the format or questions presented under the surveys. Importantly, Hackensack's expert acknowledged that the sophisticated survey participants would likely not use the direct capitalization approach to value their own properties but instead would use a discounted cash flow analysis on a "leased-up building."

Moreover, Hackensack's expert could not state how many survey responses comprised the "National Suburban Office Market" or "National CBD Market" capitalization rates that he relied on to support his capitalization rates. In addition, Hackensack's expert further acknowledged the

33

"National Suburban Office Market" and "National CBD Market" surveys fail to distinguish between a single-tenanted office building in Georgia and a multi-tenanted office building in New York.

According to Hackensack's expert, the surveys "reflect" the leasing commissions and tenant improvement allowances "in the . . . overall – in the base capitalization rates." Thus, he aligned his reconstructed operating statements and capitalization rates in the same manner, "with support from the publication that treats them the same." During cross-examination, Hackensack's expert acknowledged that the survey participants are "not concluding a valuation when they're doing their accounting." However, in Hackensack's expert's opinion, "I think they – if they were buying the buildings, they're going to take it [leasing commission expenses and tenant improvement allowances] into account in the . . . overall cap rates that they're going to pay for the building."

Significantly, however, Hackensack's expert could not explain how he would adjust the capitalization rates reported in the PwC surveys or under the Band of Investment technique to account for the tenant improvement allowances and leasing commissions being a "below-the-line" consideration. According to Hackensack's expert, "it would be hard to [show adjustments] using the data that I'm using because all the respondents treat it below the line." When urged to opine on the percentage of adjustment necessary to the capitalization rates to account for tenant improvement allowances and leasing commission expenses, Hackensack's expert was unable to do so, stating that "it's too speculative."

In addition, during cross-examination, Hackensack's expert acknowledged that the PwC investor surveys likely include real estate taxes as a stabilized operating expense. Curiously, however, he opined that he would not adjust the capitalization rates reported in the surveys because

"[w]e're looking at a range. It's not a finite number. And . . . like I said, the range gives us guidance to support our concluded cap rates." However, it is a well-settled principle of local property tax valuation that "[i]nclusion of real estate taxes as an operating expense is not permitted because the amount of real estate taxes are ultimately determined as a result of this court's finding of value . . . ." Spiegel v. Town of Harrison, 18 N.J. Tax 416, 427 (Tax 1999). Thus, although Hackensack's expert placed great weight and emphasis upon the investor survey data and its "below-the-line" approach in support of his capitalization rates, he made no adjustments to the reported capitalization rates nor could he estimate the adjustment percentage necessary, despite acknowledging that they include expenses materially deviating from the direct capitalization method employed by the court in determining true or fair market value.

Therefore, the court concludes that the Band of Investment technique provides the most accurate and reliable method of deriving a capitalization rate because it is not polluted or impacted by questions of how potential survey recipients perceived hypothetical transactional questions or how a market perceives an annually reoccurring operating expense. Importantly, although third-party surveys may offer meaningful secondary support for an appraiser's concluded capitalization rates, they should not dictate how an appraiser prepares a reconstructed operating statement and, correspondingly, values a property. As stated in The Appraisal of Real Estate, when developing a capitalization rate, published surveys are an adequate source of "support rather than as primary evidence of a capitalization rate." Id. at 466 (emphasis added). An appraiser can only discern what operating expenses are ordinary and annually reoccurring and what expenses are not by conducting a thorough investigation, examination, and analysis of a property's operations and its competitive market.

Accordingly, for the foregoing reasons, the court accords no weight to the manner or

35

formula that investor surveys may employ in deducting operating expenses to determine a property's net operating income. The court finds Hackensack's expert's reliance on the PwC surveys as support of his "below-the-line" approach to tenant improvement allowances and leasing commissions to be flawed. Hackensack's expert could not offer a meaningful or satisfactory explanation for how adjustments would be made to the surveyed capitalization rate to account for leasing commissions and tenant improvement allowances, how those adjustments would be calculated, or how the surveys treatment of real estate taxes, as a stabilized operating expense, should be adjusted to align them with his proposed below-the-line methodology.

As expressed above, the court concludes that tenant improvement allowances and leasing commissions are an annually reoccurring operating expense for the subject property and, in its competitive market, needed to stabilize occupancy and preserve the value of the subject property. Therefore, the court will employ the "above-the-line" method and deduct tenant improvement allowances and leasing commissions from effective gross income as a stabilized operating expense.

However, the court also finds that the loan-to-value ratios and equity dividend rates applied by 3 University Plaza's expert do not comport with marketplace norms. The court does not find that 3 University Plaza's expert's reliance on the ACLI tables, as the barometer for the loan-to-value ratios for the subject property, accurately reflects the type of mortgage loan that the subject property would receive. Testimony and evidence offered during trial revealed that the subject property was an aging Class A multi-tenanted office building, plagued by a prior foreclosure, allegations of mismanagement, vacancy rates exceeding the competitive market, and a secondary location. Moreover, testimony was elicited during trial that the insurance company loans identified under the ACLI tables are "one of the hardest loans to get in the real estate investment world," as

they "have very high lending criteria[]." Because the insurers maintain such high criteria, Hackensack's expert expressed that "they're probably the least risky real estate assets." To minimize exposure and risk in their investments, insurance companies offer very conservative loan-to-value ratios, seeking to ensure that property owners retain a considerable investment or equity stake. Accordingly, as a general principle, the loan-to-value ratios reported under the ACLI tables reflect the low threshold of the loan-to-value spectrum.

For the tax years at issue, the court's analysis of the ACLI tables discloses that the loan-to-value ratios for these highly sought-after loans ranged from 53.88% to 64.68%. Thus, while 3 University Plaza's expert's proffered 60% loan-to-value ratio falls within the reported ACLI range, as of all valuation dates under appeal, the court does not find that the subject property is of the type or caliber that would satisfy the stringent lending criteria for an ACLI mortgage loan.

Accordingly, based on the court's review of the supporting materials offered by both experts, the court concludes that a 70% loan-to-value ratio is more appropriate for the subject property during all tax years at issue.

In addition, the court finds that the 10% and 11% equity dividend rates proposed by 3 University Plaza's expert are not aligned with the reasonable investment expectations of investors in multi-tenanted office buildings during the tax years at issue. Here, the court's review of the market data discloses that United States 30-year treasury bonds yielded 2.88% to 3.68% during the tax years at issue. Moreover, during the tax years at issue, Aaa rated corporate bonds bore yields of 3.51% to 4.53% and Baa corporate bonds bore yields of 3.97% to 5.31%. Further, Equity REIT's reported dividend yields of 3.65% to 4.07% during the tax years at issue.[30] In addition,

---

[30] As reported in the PwC Real Estate Investor Surveys identifying the National Association of Real Estate Investment Trusts as the data source.

the PwC surveys revealed that investors forecasted value changes in the office building market of -10% to 15%. Thus, investors in the national and suburban office building market were not overly optimistic about the prospect of increasing rents, improved cash flow, and greater returns on their investments during the time periods at issue.

The court further highlights that the RealtyRates.com equity rates relied on by 3 University Plaza's expert to generate his equity dividend rates contain no property classification detail or geographical reference. Thus, the reported equity dividend rates could be generated entirely from owners of Class B, C, or D buildings in California. Accordingly, the court does not find the RealtyRates.com equity dividend rates probative and credible evidence of equity dividend rates for an aging Class A office building in northern New Jersey.

Based on the court's review of the alternate investment data offered by the experts, the yield rates for United States 30-year treasury bonds, the Aaa and Baa rated corporate bond yields, and the Equity REIT's dividend yields, the court concludes that Hackensack's expert's proposed equity dividend rates are more credible and reliable evidence of equity dividend rates in the marketplace. Therefore, the court will apply an equity dividend rate of 7% as of each valuation date involved herein.

Finally, the court's review of the ACLI tables discloses that commercial mortgage loan commitments for office buildings having a loan size of $15,000,000 to $24,999,000 bore contract interest rates of 3.39% to 4.37% during the tax years at issue. In addition, the ACLI tables further disclose that commercial mortgage loan commitments for office buildings having more than 200,000 square feet bore contract interest rates of 3.51% to 4.31% during the tax years at issue.

Thus, based on a review of the above data and information, as well as the experts' testimony and opinions, the court concludes that under the Band of Investment technique: (i) as of the

38

October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates, a mortgage interest rate of 4.00% is reasonable and supported by the evidence; (ii) as of the October 1, 2016, and October 1, 2017 valuation dates, a mortgage interest rate of 3.75% is reasonable and supported by the evidence; and (iii) as of the October 1, 2018 valuation date, a mortgage interest rate of 4.25% is reasonable and supported by the evidence. In addition, the court concludes that a 25-year loan amortization period for each tax year under appeal is reasonable and supported by the evidence.

Accordingly, using the Band of Investment technique, the base capitalization rate is:

(i) as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates:

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 4.00% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.334 | | | |
| Mortgage component | 70% | X | 6.334 = | 4.43 |
| Equity divided rate | 7.00% | | | |
| Equity component | 30% | X | 7.00 = | 2.10 |
| | | | | 6.53% |

(ii) as of the October 1, 2016 and October 1, 2017 valuation dates:

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 3.75% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.170 | | | |
| Mortgage component | 70% | X | 6.170 = | 4.32 |
| Equity divided rate | 7.00% | | | |
| Equity component | 30% | X | 7.00 = | 2.10 |
| | | | | 6.42% |

(iii) as of the October 1, 2018 valuation date would be:

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 4.25% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.501 | | | |
| Mortgage component | 70% | X | 6.501 = | 4.55 |
| Equity divided rate | 7.00% | | | |
| Equity component | 30% | X | 7.00 = | 2.10 |
| | | | | 6.65% |

Accordingly, for the reasons set forth above, the court finds the true or fair market value of the subject property, under the income-capitalization approach, to be $20,150,000, as of the

October 1, 2013 and October 1, 2014 valuation dates.[31]  The court's calculation of true or fair market value is as follows:

**2014 and 2015 Tax Years (above-the-line)**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.75 PSF | @ 225,439 sq. ft. | $4,903,298 |
| Tenant electric | $ 1.75 PSF | @ 225,439 sq. ft | $ 394,518 |
| TOTAL: | POTENTIAL GROSS INCOME | | $5,297,816 |
| LESS: | Vacancy & Collection Loss | @ 14% PGI | ($ 741,694) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $4,556,122 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Base Operating Exp. | @ $7.50 x 225,439 sq. ft. | $1,690,793 |
| Management | @ 3% of EGI | $ 136,684 |
| Replacement Reserves | @ 1.5% of EGI | $ 68,342 |
| Leasing Commissions | @ 5% of EGI | $ 227,806 |
| Tenant Imp. Allowance | @ $2.17 x 225,439 sq. ft. | $ 489,203 |

| | |
|---|---|
| TOTAL: STABILIZED EXPENSES | ($2,612,828) |
| NET OPERATING INCOME | $1,943,294 |

| | |
|---|---|
| Base Capitalization Rate: | 6.53% |
| Plus: Effective Tax Rate: | 3.12% |
| TOTAL CAPITALIZATION RATE: | 9.65% |

| | |
|---|---|
| **INDICATED VALUE: [ROUNDED]** | **$20,150,000** |

---

[31]  The subject property's true or fair market value for the 2016 through 2019 tax years will be determined after the court addresses the Director's average ratio of assessed to true value to be applied, thus, the effective tax rate.

**2016 Tax Year (above-the-line)**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.75 PSF | @ 225,439 sq. ft. | $4,903,298 |
| Tenant electric | $ 1.75 PSF | @ 225,439 sq. ft | $ 394,518 |
| TOTAL: | POTENTIAL GROSS INCOME | | $5,297,816 |
| LESS: | Vacancy & Collection Loss | @ 14% PGI | ($ 741,694) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $4,556,122 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Base Operating Exp. | @ $7.50 x 225,439 sq. ft. | $1,690,793 | |
| Management | @ 3% of EGI | $ 136,684 | |
| Replacement Reserves | @ 1.5% of EGI | $ 68,342 | |
| Leasing Commissions | @ 5% of EGI | $ 227,806 | |
| Tenant Imp. Allowance | @ $2.17 x 225,439 sq. ft. | $ 489,203 | |
| TOTAL: STABILIZED EXPENSES | | | ($2,612,828) |
| NET OPERATING INCOME | | | $1,943,294 |

| | |
|---|---|
| Base Capitalization Rate: | 6.53% |
| Plus: Effective Tax Rate: | TBD |
| TOTAL CAPITALIZATION RATE: | TBD |

| | |
|---|---|
| INDICATED VALUE: [ROUNDED] | TBD |

**2017 Tax Year (above-the-line)**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.75 PSF | @ 225,439 sq. ft. | $4,903,298 |
| Tenant electric | $ 1.75 PSF | @ 225,439 sq. ft | $ 394,518 |
| TOTAL: | POTENTIAL GROSS INCOME | | $5,297,816 |
| LESS: | Vacancy & Collection Loss | @ 14% PGI | ($ 741,694) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $4,556,122 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Base Operating Exp. | @ $7.50 x 225,439 sq. ft. | $1,690,793 | |
| Management | @ 3% of EGI | $ 136,684 | |
| Replacement Reserves | @ 1.5% of EGI | $ 68,342 | |
| Leasing Commissions | @ 5% of EGI | $ 227,806 | |
| Tenant Imp. Allowance | @ $2.17 x 225,439 sq. ft. | $ 489,203 | |
| TOTAL: STABILIZED EXPENSES | | | ($2,612,828) |
| NET OPERATING INCOME | | | $1,943,294 |

| | |
|---|---|
| Base Capitalization Rate: | 6.42% |
| Plus: Effective Tax Rate: | TBD |
| TOTAL CAPITALIZATION RATE: | TBD |

| | |
|---|---|
| INDICATED VALUE: [ROUNDED] | TBD |

**2018 Tax Year (above-the-line)**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.75 PSF | @ 225,439 sq. ft. | $4,903,298 |
| Tenant electric | $ 1.75 PSF | @ 225,439 sq. ft | $ 394,518 |
| TOTAL: | POTENTIAL GROSS INCOME | | $5,297,816 |
| LESS: | Vacancy & Collection Loss | @ 14% PGI | ($ 741,694) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $4,556,122 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Base Operating Exp. @ $7.50 x 225,439 sq. ft. | $1,690,793 | |
| Management @ 3% of EGI | $ 136,684 | |
| Replacement Reserves @ 1.5% of EGI | $ 68,342 | |
| Leasing Commissions @ 5% of EGI | $ 227,806 | |
| Tenant Imp. Allowance @ $2.17 x 225,439 sq. ft. | $ 489,203 | |
| TOTAL: STABILIZED EXPENSES | | ($2,612,828) |
| NET OPERATING INCOME | | $1,943,294 |

Base Capitalization Rate:          6.42%
Plus: Effective Tax Rate:          TBD
TOTAL CAPITALIZATION RATE:    TBD

INDICATED VALUE: [ROUNDED]                                TBD

**2019 Tax Year (above-the-line)**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.75 PSF | @ 225,439 sq. ft. | $4,903,298 |
| Tenant electric | $ 1.75 PSF | @ 225,439 sq. ft | $ 394,518 |
| TOTAL: | POTENTIAL GROSS INCOME | | $5,297,816 |
| LESS: | Vacancy & Collection Loss | @ 14% PGI | ($ 741,694) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $4,556,122 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Base Operating Exp. @ $7.50 x 225,439 sq. ft. | $1,690,793 | |
| Management @ 3% of EGI | $ 136,684 | |
| Replacement Reserves @ 1.5% of EGI | $ 68,342 | |
| Leasing Commissions @ 5% of EGI | $ 227,806 | |
| Tenant Imp. Allowance @ $2.17 x 225,439 sq. ft. | $ 489,203 | |
| TOTAL: STABILIZED EXPENSES | | ($2,612,828) |
| NET OPERATING INCOME | | $1,943,294 |

Base Capitalization Rate:          6.65%
Plus: Effective Tax Rate:          TBD
TOTAL CAPITALIZATION RATE:    TBD

INDICATED VALUE: [ROUNDED]                                TBD

F.    Subject property sale

In 3 University Plaza's expert's opinion, the subject property was adequately marketed, and the November 6, 2019 sale for $16,620,000 was an arms-length transaction between two unrelated parties.  Thus, he concluded that it closely represented true market value.

In the court's journey to determine the true market value of real property, the focus of the inquiry is "the fair value of the property, the price a willing buyer would pay a willing seller." New Brunswick v. State Div. of Tax Appeals, 39 N.J. at 543.  The term market value has been defined as:

> the most probable price, as of a specified date, in cash or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
>
> [The Appraisal of Real Estate, 58 (14th ed. 2013).]

Thus, although the sale of a property is indicative of an exchange of consideration between parties, it may not be dispositive on the issue of market value.  "[T]here may be instances when the sale price may not reflect true market value.  In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value."  Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 282 (1985). Thus, a property sale "is a reliable indicator of fair market value if the following criteria are satisfied:

1) buyer and seller are typically motivated and neither is under duress;
2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
4) the purchase price is paid in cash or its equivalent; and
5) the purchase price is unaffected by special or creative financing or by other

43

special factors, agreements, or considerations."

> [Venture 17, LLC v. Hasbrouck Heights Bor., 27 N.J. Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp., 16 N.J. Tax at 94.]

Hence, an appraiser's opinion that a sale represents market value must not only focus on the relationship between the buyer and the seller and whether the property is adequately exposed to the marketplace. Rather, an appraiser must conduct a thorough investigation of the sale transaction to ascertain the motivations and objectives of the parties, changing market conditions, and whether the agreed-upon sales price was affected by special considerations, factors, or agreements.

Here, although 3 University Plaza and the buyer were unrelated, and the subject property was marketed for sale with a reputable real estate broker and seemingly exposed to the market, the court finds that the sale price was impacted or affected by other factors or considerations. Thus, the subject property's sale price did not reflect true market value as of any of the valuation dates involved in these local property tax appeals.

The court highlights that the subject property's Confidential Offering Memorandum states that it was a "Value-Add Opportunity . . . in an opportunity zone." In addition, the Memorandum reinforces the principle that the subject property is a "value-add opportunity" for prospective investors, as it "will be delivered 67% leased . . . providing . . . the opportunity to increase NOI by more than $1,000,000 via renovations and amenity upgrades." The marketing material further presents the subject property as offering a "significant repositioning opportunity" in the marketplace through the implementation of a "rebranding" and "a much[-]needed common area improvement program & increase rents and occupancy." The brochure echoes that a new investor can "create value [in the subject property] by adding fitness & conference centers, enhancing cafeteria & outdoor area" and "increase occupancy and drive rental rate growth." Finally, the

44

Memorandum states that "3 University Plaza Drive presents the opportunity to increase NOI by more than $1 million via capital improvements, cosmetic enhancements and lease-up of remaining available space."

Although 3 University Plaza's expert disagreed with the characterization of the subject property as a "value-add opportunity," he readily acknowledged that it has experienced historically high vacancy rates and that its occupancy is not stabilized. A review of those historical vacancy rates discloses that the subject property experienced vacancies almost double those reported under the REIS Office Market Report for the Hackensack/Teaneck Office submarket and more than double the CoStar Northern New Jersey Office Market Report for the Bergen East submarket. Moreover, Hackensack's expert's testimony revealed that several current and former building tenants expressed dissatisfaction with the management's failure to address the condition of building common areas, including the restrooms. These sentiments lead the court to conclude that the disclosures contained in the real estate broker's brochure about a "much needed common area improvement program" accurately depict the property as an aging Class A office building, in need of cosmetic enhancements and amenity upgrades.

Importantly, the subject property's sale occurred on November 6, 2019, more than thirteen months following the last valuation date involved in these local property tax appeals. Moreover, Mr. Carlson credibly testified that between 2019 and 2020, "the market was . . . coming down," and the subject property's sale "seemed like an . . . outlier" in the market.

Accordingly, the court finds that the subject property's historically high vacancy rates, the need for physical enhancements and upgrades, substandard net operating income, and deteriorating economic conditions in the office building marketplace were the driving forces in establishing the subject property's sale price. Thus, the court finds that the subject property's sale was not credible

45

evidence of its true or fair market value, as of any of the valuation dates involved herein.

  D. Corrected property tax assessment

  Having reached a conclusion of the subject property's true or fair market value for the 2014 and 2015 tax years, the court will determine the correct assessments. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property . . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| True market value | x | Average ratio | = | Revised taxable value |
|---|---|---|---|---|

  For the 2014 tax year, the ratio of total assessed value, $21,779,700, to true market value, $20,150,000, yields a ratio of 1.081%, which exceeds the upper limit of the Chapter 123 common level range. Consequently, the total assessment calculation for the subject property's three parcels for the 2014 tax year is:

$$\$20,150,000 \quad x \quad .9386 \ = \quad \$18,913,000 \text{ [ROUNDED]}$$

  Accordingly, judgments establishing the subject property's local property tax assessments for the 2014 tax year will be entered as follows:

| Block 500, Lot 97 | | Block 500, Lot 101 | |
|---|---|---|---|
| Land | $11,212,000 | Land | $517,600 |
| Improvement | $ 6,622,100 | Improvement | $ 17,700 |
| Total | $17,834,100 | Total | $535,300 |

Block 500.02, Lot 2
| | |
|---|---|
| Land | $521,000 |
| Improvement | $ 22,600 |
| Total | $543,600 |

For the 2015 tax year, the ratio of total assessed value, $21,779,700, to true market value, $20,150,000, yields a ratio of 1.081%, which exceeds the upper limit of the Chapter 123 common level range. Consequently, the total assessment calculation for the subject property's five parcels for the 2015 tax year is:

$$\$20{,}150{,}000 \quad \times \quad .8922 \quad = \quad \$17{,}978{,}000 \text{ [ROUNDED]}$$

Accordingly, judgments establishing the subject property's local property tax assessments for the 2015 tax year will be entered as follows:

Block 500, Lot 97
| | |
|---|---|
| Land | $10,650,000 |
| Improvement | $ 6,302,100 |
| Total | $16,952,100 |

Block 500, Lot 101
| | |
|---|---|
| Land | $492,000 |
| Improvement | $ 17,100 |
| Total | $509,100 |

Block 500.02, Lot 2
| | |
|---|---|
| Land | $495,300 |
| Improvement | $ 21,500 |
| Total | $516,800 |

Contemporaneously with the issuance of this opinion, the court is entering final judgments in the 2014 and 2015 tax year matters. The court will schedule the 2016, 2017, 2018, and 2019 tax year matters for further proceedings.