KAHN, J.T.C.
This matter involves a local property tax appeal wherein taxpayer seeks a reduction in the assessment of land and improvements located in the municipality of Harrison, County of Hudson. The assessments appealed from for the three years in question are as follows:
1996:
Land $2,860,000
Improvements 2,640,000
Total $5,500,000
1997:
Land $2,860,000
Improvements 2,317,500
Total $5,177,500
1998:
Land $2,860,000
Improvements 2,317,500
Total $5,177,500
*420 The average ratios (assessment to true value) for the Town of Harrison as promulgated by the Director of the Division of Taxation (N.J.S.A. 54:l-35a and -35.1) for the same three years in question are as follows:
1996 87.78%
1997 88.62%
1998 90.80%
The land in question is 14.3 acres. Improvements consist of three separately described sets of buildings as follows:
A. Main warehouse building constructed in 1938, totaling 274,-326 square feet. The first floor consists of 248,286 square feet and a second floor mezzanine area consists of 26,040 square feet. In 1987, a 49,504 square foot addition to this building was completed.
B. Three separate one-story buildings: 1) a brick exterior building consisting of 10,594 square feet, 2) a metal-clad building consisting of 11,812 square feet, and 3) a metal-clad building, consisting of 2,016 square feet.
C. A two-story building totaling 31,000 square feet consists of a restaurant on the ground floor and offices on the second floor. The parties stipulated the value of this improvement at $195,000 for each tax year in issue.
Both appraisal expert witnesses utilized the market sales and income capitalization approaches to value. The parties further stipulated the applicable zoning of the property to be light industrial.
In an effort to further narrow the issues, the parties entered into stipulations with regal’d to essential factors within the income capitalization approach. The first stipulation was to a 10.52% capitalization rate applicable for each year in issue. Second, the parties agreed to a 5% vacancy and collection loss factor with respect to the warehouse improvements and a 10% factor for the three smaller buildings. Finally, the parties agreed that the area of the originally constructed portion of the warehouse was 274,326 square feet and the 1987 addition was 49,504 square feet.
*421 This court finds that the market sales analysis is unreliable as a method of valuation of the subject property. Both expert witnesses provided purported comparable sales with typical adjustments, including size, location, and utility. From the photographs included in each appraisal report and the various descriptions of the comparables, vis-a-vis the subject, the adjustments made by each expert are not appropriate. If there were any similarities between the comparables and the subject, the comparability at best was the fact that all the buildings were industrial in nature. In addition, this approach was useless with respect to the three smaller buildings on the subject property since no comparisons were offered. Both experts acknowledged that a prospective purchaser would more likely rely upon an income analysis than upon a comparable sales analysis. Both expert witnesses also acknowledged the extensive subjective nature of the adjustments. The appraisal experts’ primary reliance on the income capitalization approach is demonstrated by their willingness, as aforesaid, to stipulate to essential elements of this approach.
Accordingly, this court finds the income capitalization approach to be the only reliable method of valuation in this case.
Despite the stipulations entered into by the parties with respect to the capitalization rate, the vacancy and collection loss factor, and the extent of square footage, there are differences of opinion between the parties in other areas that need be resolved by this court.
The first step in the analysis is with respect to the establishment of market rent. Taxpayer’s appraisal expert places primary reliance upon existing leases during the relevant tax years. The larger warehouse area was the subject of a lease negotiated in 1995 and executed in 1996. That lease provided for $1.33 per square foot, plus an additional $170,000 per year to be paid to the landlord in the nature of a tax reimbursement. Taxpayer’s expert viewed this as a modified gross lease in that landlord would be responsible for some of the taxes, and opined that this was the best evidence of market rent for the property. To bolster his opinion that the subject lease was the best evidence of market *422 rent, he utilized several purported comparable rents, however, said comparables were net leases (landlord is not responsible for real estate taxes). The expert adjusted the comparable rents in order to arrive at a market rent on a modified gross basis. With respect to the smaller buddings, the witness also urged that rentals received by taxpayer amounting to $.59 per square foot for one building and $1.02 for the other, also constituted market rent on a modified gross basis for these smaller buildings. The appraisal expert provided no comparable leases in support of his conclusion.
The municipality’s appraisal expert also provided leases of comparable properties, all located in the neighboring municipality of Kearny, demonstrating net rentals ranging from between $3.25 per square foot and $4 per square foot prior to adjustments. After the usual adjustments for size, utility, location, etc., the municipality’s expert witness adjusted the comparables to a range between $2.06 per square foot and $2.80 per square foot, concluding a market rent of $2.25 per square foot net for the 248,286 square feet of original warehouse space. He opined that all possible comparables were leased on a net basis, therefore, concluding that market rent would be on a net basis. He also concluded that the 26,040 square foot mezzanine provided less utility than the main warehouse and consequently, after further adjustments, he concluded $1.13 per square foot net as market rent for that portion of the building. With respect to the 1987 addition, primarily because of its more recent construction and greater utility and condition, he concluded $3.25 per square foot net as market rent.
This same witness also analyzed the three smaller buildings, concluding a $2.25 per square foot net rental by utilizing the same. comparable rentals of much larger demised areas. The witness did not give much weight to the existing rentals, but adjusted his comparables to account for the significantly smaller square footage of these three units. The municipality’s appraisal expert placed much reliance on the principle that smaller units of space command a higher rent per square foot.
*423 There is no satisfactory explanation for what appears to be an unusual provision in the warehouse lease providing for a flat ($170,000) tax reimbursement. Despite the fact that the exact taxes would not be known to the parties during the tax year under appeal, a question arises as to whether or not the flat tax should be considered as an additional rent or a tax reimbursement. Both expert witnesses utilized net comparable leases. This court, therefore, finds market rent to be on a net basis, wherein, the tenant is responsible for the real estate taxes. The subject lease of the main warehouse appears to be unusual and not typical of the market place.
With respect to the determination of market rent on a net basis, this court finds that both expert witnesses provided comparable i*entals requiring significant subjective adjustments, but there is a sufficient sampling of comparables from which this court can determine market rent.
The Supreme Court in Glen Wall Assocs., v. Wall Tp., 99 N.J. 265, 280, 491 A.2d 1247 (1985), rev’g 6 N.J.Tax 448 (App.Div.1984), aff’g 6 N.J.Tax 24 (Tax 1983) held that the Tax Court should determine value from the evidence submitted, based upon the Tax Court’s knowledge and expertise. The Court quoted New Cumberland Corp. v. Roselle Borough, 3 N.J.Tax 345, 353 (Tax 1981):
The Tax Court has not only the right, but the duty to apply its own judgment, to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question.
[Glen Wall Assocs., supra, 99 N.J. at 280, 491 A.2d 1247 (citation omitted).!
This court is not bound to accept an expert witness’ opinion in loto. An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).
This court first finds that the 274,326 square foot of the main warehouse would be rented to include the 26,040 square foot of the mezzanine area. There is no evidence that the mezzanine area would be the subject of a separate tenancy since this court agrees *424 that said mezzanine does not have the same degree of utility as the main portion of the warehouse.
The subject lease of the main warehouse, although on a modified gross basis, at $1.33 per square foot does provide some indication as to its rental value. The municipality’s rental estimate is based upon comparable rents which this court finds were not adequately adjusted. From the photographs and descriptions, the purported comparables appear to be in better condition and better located than the subject. Taking these factors into consideration, this court finds market rent for the 274,326 square foot warehouse to be $1.50 per square foot on a net basis.
The evidence demonstrates a higher market rent for the 49,504 square foot addition to the warehouse. Obviously, its more recent construction (1987) provides greater utility and better condition. Utilizing the principle generally acknowledged by both parties in this case that smaller demised areas command a higher per square foot rent than significantly larger areas of similar space, this court finds that the recently constructed addition would command a higher per square, foot rental than the older space. Accordingly, utilizing all of the comparables submitted to this court, and specifically the above-mentioned factors, this court finds market rent for the 49,504 square foot addition to be $2.20 per square foot for all years in question.
With respect to the three smaller buildings, no comparables were submitted by either party that involved similar size or construction. The only specific evidence involves the subject leases for $.59 per square foot for one unit and $1.02 per square foot for the other. There is no explanation with respect to the specifics of the leases except one tenant is a metal fabricator and the other is an automobile repair shop. There is some indication that a relationship exists between taxpayer and the tenant occupying the automobile shop, but not enough evidence to conclude that the lease was either an arm’s length transaction or, on the other hand, a transaction between related parties.
These three smaller buildings are more comparable to the older warehouse building (except for size of the demised area) than the *425 1987 addition. This court finds that market rent would necessarily be higher than the rent received under the existing leases. This court finds that these three smaller buildings are the same as the older warehouse with respect to age, condition, and location. The main, obvious difference is size. This court finds that this significant size difference between the three smaller buildings and the older subject warehouse area would require the smaller buildings to receive a larger per square foot rental. Based on all the information supplied by the parties, this court finds market rent for the three smaller buildings to be $1.65 per square foot.
 In the income capitalization analysis, the first step, as aforesaid, is to determine market rent which, when applied to the square footage of the subject property, produces potential gross income (PGI). In developing the estimated income stream from which the income capitalization process begins, “economic” or market rent must be calculated.
The Appellate Division in First Real Estate Investment Trust of New Jersey v. Hasbrouck Heights Boro., 190 N.J.Super. 85, 90, 461 A.2d 1210 (App.Div.), certif. denied, 95 N.J. 202, 470 A.2d 423 (1983) states:
as pointed out, in The Appraisal of Real Estate, supra:
A gross income estimate is basic to the income approach to a value indication, but since this estimate involves future projections, adequate and dependable current market research is basic to the gross income estimate. The future cannot be forecast with certainty, but trends can be analyzed and current market actions can be identified which affect future income expectancies. Appraisal practice requires that appraisers study and identify important supply and demand relationships. Such analyses are critical to income forecasting and evaluation of risks, (quoting American Institute of Real Estate Appraisers, The Appraisal of Real Estate, at 833 (8 ed.1983)).
From PGI, there is a deduction for vacancy and collection loss. No issue exists with respect to this deduction since the parties have stipulated to a 5% deduction for the warehouse property and 10% for the three smaller buildings. The deduction of vacancy and collection loss from PGI produces effective gross income (EGI). Although the expert witnesses did not enter into a stipulation with respect to expenses, a review of the appraisal reports demonstrates the anomaly that the municipality’s expert witness *426 produced a higher level of operating expenses, than taxpayer’s expert witness. The municipality’s appraisal expert utilized solely percentages of EGI. Taxpayer’s appraisal expert also provided a management and miscellaneous expense as a percentage of EGI, but calculated an insurance expense at $15,000 annually and reserves for replacement at $.20 per square foot. This court finds that the municipality utilized a more reliable approach to determine the percentage of EGI in this case.
The municipality’s expert provided management at 4% of EGI, structural repairs at 4% of EGI, leasing commissions'at 3% of EGI, and miscellaneous, which includes professional expenses, at 2% of EGI, totaling 13% of EGI. The municipality’s expert witness’ conclusions as to expenses appear to be based upon his belief that expenses generally are best estimated as a function of EGI. He undoubtedly recognized that, with the exception of the 1987 addition, the subject improvements are older and require higher expenditures to maintain adequate condition with a view to receiving rent.
Accordingly, this court finds that the municipality’s appraisal expert’s opinion with respect to operating expenses (13% total of EGI) is more reliable. Upon deducting said, operating expenses from EGI, the result is the property’s net operating income (NOI).
The last of the factors utilized to obtain market value by means of the capitalization approach is the capitalization rate. The capitalization rate combines the cost of' borrowed funds (mortgage constant consisting of interest and amortization) and the rate of return a prospective investor expects to earn on his invested funds. The combination of these two rates, in the proportion of invested capital to borrowed funds, produces the capitalization rate. Dividing the capitalization rate into NOI produces the properties value.
In this case the parties have stipulated the overall capitalization rate at 10.52% for each year in question. When the income analysis is based upon rentals, wherein the landlord is required to pay all or' a portion of real estate taxes without *427 reimbursement (gross or modified gross leases), the effective tax rate is added to the overall capitalization rate to account for the landlord’s real estate tax expense. Inclusion of real estate taxes as an operating expense is not permitted because the amount of real estate taxes are ultimately determined as a result of this court’s finding of value, and thereafter, the appropriate assessment.
In this ease, as previously determined, the more reliable evidence suggests that market rent is on a net basis (landlord not responsible for real estate taxes); accordingly, no effective tax rate is added to the overall capitalization rate of 10.52%. For each year in question, therefore, dividing the net operating income by the capitalization rate produces the value of the subject property.
The following is this court’s finding of true value in accordance with the aforementioned process:
Main whse. $1.50 x 274,326 sq.ft. $411,489
1987 Addit’n. 2.20 x 49,504 sq.ft. 108,909
$520,398 market rent x 5% vacancy
-26,020
520,398
494.378 EGI x 18% operat.exp.
-64,269 494.378
$430,109 NOI
3 small bldgs. $1.65 x 24,422 sq.ft. $ 40,296 x 10% vacancy
-4,029 40,296
36.267 EGI x 13% operat.exp.
-4,715 36.267
$31,552 NOI
*428 $430,109 + 31,552
$461,661 Total NOI
$461,661 + 10.52% = $4,388,412 Whse. & 3 sm.bld gs. + 195,000 Stipu.value of restaurant bldg.
$4,583,412 Total value for 3 years in question.
To fully derive the appropriate assessment for each year, N.J.S.A. 54:51A-6, commonly known as Chapter 123, must be applied where applicable. The tax years, 1996, 1997 and 1998, were not reassessment or revaluation years, therefore, Chapter 123 applies. Passaic Street Realty Assoc., Inc. v. Garfield City, 13 N.J.Tax 482, 485 (Tax 1994) In each of those years, the ratio of assessment to true value was more than 100%, which requires relief to the taxpayer by applying the average ratio promulgated by the Director of the Division of Taxation to this court’s finding of true value. In 1996 the average ratio was 87.78%; in 1997, 88.62%; and in 1998, 90.30%. In applying the average ratios where applicable, this court calculates as follows:
1996 $4,023,063, rounded to $4,023,100
1997 $4,061,820, rounded to $4,061,800
1998 $4,138,821, rounded to $4,138,800
In each of the three years in question, the land assessment was $2,860,000. This court, therefore, will maintain the same assessment for land and apply the changes in assessment to the improvements. Accordingly, this court enters judgment as follows:
1996 Land $2,860,000
Improvements 1,163,100
Total $4,023,100
1997 Land $2,860,000
Improvements 1,201,800
Total $4,061,800
1998 Land $2,860,000
Improvements 1,278,800
Total $4,138,800