# TAX COURT OF NEW JERSEY



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

February 21, 2025

Richard P. DeAngelis, Esq.
Connell Foley, LLP
56 Roseland Avenue
Roseland, New Jersey 07068

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue, Suite 310N
Lyndhurst, New Jersey 07071

      Re:    <u>Colt Arms Preservation Urban Renewal, L.P. v. Paterson City</u>
               Docket No. 007403-2024

Dear Mr. DeAngelis and Mr. Turner:

This letter shall constitute the court's opinion following trial of the 2024-year local property tax appeal instituted by plaintiff, Colt Arms Preservation Urban Renewal, L.P. ("Colt Arms").

Colt Arms is the owner of the real property and improvements located at 18-56 Godwin Street, Paterson, New Jersey (the "subject property").[1]  The subject property is identified on the municipal tax map of the City of Paterson ("Paterson"), as block 3712, lot 28.

At the commencement of trial, Colt Arms and Paterson stipulated to the subject property's

---

[1] Hudson Valley Property Group, through Colt Arms Preservation HV, LLC, owns a 0.01% interest in Colt Arms and R4 CANJ Acquisition, LLC, the investor partner, owns a 99.99% interest.  The Financial Statement Notes for Colt Arms for tax years ending December 31, 2022 and December 31, 2023, reflect that "profits and losses from operations are allocated 99.99% to the investor partner and 0.01% to the managing partner.  However, there is also a provision that requires an income allocation be made to the managing partner equal to the distributions it receives."






potential gross income, vacancy and collection loss allowance, other income, effective gross income, stabilized expenses, and net operating income. Therefore, the sole issues remaining in dispute at trial were the base capitalization rate that should be applied to the subject property's reconstructed net operating income and Paterson's effective tax rate for the 2024 year.

For the reasons stated more fully below, the court reduces the subject property's 2024 tax year assessment.

## I.      **Procedural History and Factual Findings**

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony introduced during trial.

The real property consists of a rectangular-shaped parcel comprising 2.753-acres. The real property is improved with a thirteen-story brick, multi-family, age-restricted, affordable housing apartment building and surface parking lot. The building has a gross area of approximately 150,956 square feet and contains 207 apartments. There are 50 studio apartment units, 156 one-bedroom apartment units, and 1 superintendent unit (which is non-revenue producing). The building was initially constructed in 1972 as a HUD Section 236 project, however, on or about January 15, 2016, Colt Arms purchased the subject property for reported consideration of $9,600,000, and "de-coupled" it from Section 236, converting it into a Low-Income Housing Tax Credit ("LIHTC") project.[2] As part of the de-coupling of the subject property from Section 236

---

[2] The LIHTC program has been described as "the most important resource for creating affordable housing in the United States today. Created by the Tax Reform Act of 1986, the LIHTC program gives State and local LIHTC-allocating agencies the equivalent of approximately $10 billion in annual . . . authority to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households." U.S. Department of Housing and Urban Development, Office of Policy Development and Research, https://www.huduser.gov/portal/datasets/lihtc.html (Last visited on February 21, 2025).






and entry into the LIHTC program, the building was substantially renovated in 2016 with the investor partner contributing approximately $12 million for building renovations.[3]

In or about January 2016, Colt Arms executed a Housing Assistance Program ("HAP") contract, for a fifteen-year term, for 154 apartment units with the U.S. Department of Housing and Urban Development and a HUD Section 8 voucher contract for 44 apartment units.[4]  Thus, 198 apartment units in the subject property are governed under rental subsidy programs.  The remaining 8 apartment units remain under the HUD Section 236 program.

During trial, Colt Arms elicited fact witness testimony from Laura Yanushpolsky, the Director of Asset Management for Hudson Valley Property Group.  In addition, during trial Colt Arms and Paterson each offered testimony from New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the real property valuation field (the "expert" or "experts").  The experts prepared appraisal reports expressing their opinions of the subject property's true market value as of the October 1, 2023 valuation date.  The appraisal reports contained numerous photographs of the subject property's interior and exterior.

As of the valuation date, the subject property's tax assessment, implied equalized value, and each expert's value conclusion is set forth below:

---

[3]  In consideration for its investment in the subject property, R4 CANJ Acquisition, LLC received $10 million in tax credits.  The Notes to Financial Statements for Colt Arms for the tax years ending December 31, 2022 and December 31, 2023, reflect that the "tax credits available (under income averaging set-aside) to the investor partner [R4 CANJ Acquisition, LLC], is $796,356 for 2016, $923,203 for 2017, $941,678 for 2018 through 2021 and projected to be $941,678 from 2022 through 2025 and $145,237 in 2026 and $18,391 from 2027 through 2030."

[4]  On March 20, 2018, Colt Arms granted a Deed of Easement and Restrictive Covenant on the subject property to the New Jersey Housing and Mortgage Finance Agency memorializing its agreement to maintain the subject property under the LIHTC program and as an age-restricted (62+) low-income apartment building.  The Deed of Easement requires Colt Arms to use the subject property as age restricted affordable housing through 2047.






| Valuation date | Tax assessment | Director's avg. ratio of assessed to true value[5] | Implied equalized value | Colt Arms' expert | Paterson's expert |
|---|---|---|---|---|---|
| 10/1/2023 | $13,570,000 | 51.20% | $26,503,906 | $18,951,760 | $23,161,900 |

The testimony elicited during trial, along with the appraisers' photographs, depict a renovated and well-maintained apartment building. The photographs of several representative apartment units disclose attractive vinyl composite wood-style flooring in the kitchen and living areas and carpeting in the bedrooms (in the one-bedroom units). The kitchens are pleasantly appointed with painted and stained wood upper and lower cabinetry and Formica style countertops. Each kitchen is equipped with a stainless-steel sink, combination range/oven, and a refrigerator. Each bathroom features ceramic wall and floor tiling, a toilet, a pedestal sink, a bathtub/shower, a mirrored medicine cabinet, and assorted stainless steel grab bars.

The subject property's renovations also included the installation of a new boiler, new HVAC system, and installation of ADA compliant sidewalks.

The building's amenities feature two renovated community rooms and a resident lounge containing acoustic tile ceilings, recessed lighting, and vinyl or vinyl composite wood-style flooring. The rooms are equipped with sofas, tables, chairs, a wall mounted television, and a shuffleboard table. In addition, the building contains a large laundry room, and a surface parking lot for sixty-nine automobiles. The building is serviced by two passenger elevators.

The subject property is located between Goodwin Street and Memorial Drive in Paterson's B-3 General Business Zoning District, approximately 6 blocks away from Paterson's Center City Commercial Business District. However, the B-3 General Business Zoning District apparently

---

[5] See New Jersey Division of Taxation, 2024 Table of Equalized Valuations, https://www.nj.gov/treasury/taxation/pdf/lpt/chap123/2024ch123.pdf.






does not permit multi-family residential development, thus the use of the subject property as a multi-family residential building is a legal, non-conforming use.

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey






City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that the challenging party has not carried its burden, dismissal of the action is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Here, affording Colt Arms all reasonable inferences that could be deduced from the evidence, the court finds that it produced cogent evidence sufficient to overcome the presumption of validity. Colt Arms' expert's opinions, if accepted by the court as true, raise debatable questions as to the validity of the subject property's 2024 tax year assessment.

B. Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Determining the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 268 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).






Here, the experts reached different conclusions regarding the subject property's highest and best use, as vacant. According to Colt Arms' expert, Paterson's B-3 Zoning District "allows for multi-family" structures.[6] Thus, Colt Arms' expert concluded in his report that the subject property's highest and best use, as vacant, is for "a multifamily development." In contrast, according to Paterson's expert, the "B-3 (General Business) Zoning District . . . does not permit multi-family residential development." Thus, Paterson's expert concluded in his report that the subject property's highest and best use, as vacant, is for "mixed use development consistent with zoning."

Although neither expert produced a copy of Paterson's zoning code in their appraisal reports, Paterson's expert's report did include a reproduced list of the permitted uses in the B-3 Zoning District. The court's review of that reproduced list did not reveal that multi-family residential is a permitted use or a conditional use. Therefore, the court finds Paterson's expert's conclusion that the highest and best use of the subject property, as vacant, is for "mixed use development consistent with zoning," to be more credible.

However, both experts concluded that the subject property's highest and best use as improved, is its current use as a multi-family apartment building. Therefore, the court concludes, as did both experts, that the highest and best use of the subject property, as improved, is continuation of its present use as a multi-family apartment building.

C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor

---

[6] Colt Arms' expert's report states, "[t]he existing use is a permitted use. The current use predates zoning, and is legal, and non-conforming with current zoning code. Current zoning requirements for setback and parking make this non-conforming."






St. LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004), aff'd, 23 N.J. Tax 9 (App. Div. 2005) (citing Samuel Hird & Sons, Inc., 87 N.J. Super. at 72); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (internal citation omitted). "The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of N.Y. v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610 (Tax 1985).

Here, the experts expressed, and the court agrees, that the income capitalization approach is the most appropriate method to derive an estimate of the subject property's true or market value.

At the commencement of trial, Colt Arms' counsel read into the record the following stipulations under the income capitalization approach, as of the October 1, 2023 valuation date:

| | | |
|---|---|---|
| Potential Gross Income (PGI) | $3,410,000 | |
| Vacancy & Collection Loss Allowance | ($ 93,775) | (2.75% of PGI) |
| Other Income | $ 11,500 | |
| Effective Gross Income | $3,327,725 | |
| Stabilized Expenses | ($1,507,200) | |
| Net Operating Income | $1,820,525 | |

Thus, the sole remaining issues in dispute are the base capitalization rate and effective tax rate that must be applied to the subject property's net operating income to discern an estimate of


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



the subject property's true or market value.[7]

1. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." Appraisal Institute, The Appraisal of Real Estate 491 (14th ed 2013); Prudential Ins. Co. of Am. v. Parsippany-Troy Hills Twp., 16 N.J. Tax 58, 60 (Tax 1995), aff'd, 16 N.J. Tax 148 (App. Div. 1996); Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of market value.

Here, in deriving their capitalization rates, Colt Arms' expert and Paterson's expert employed the band of investment technique and reviewed published investor survey data.[8] The band of investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

---

[7] As of the trial date, Paterson had not adopted its year 2024 tax rate. Accordingly, the experts' reports included estimated effective tax rates (2.51% and 2.606%). The effective tax rate is needed to derive the loaded capitalization rate that is applied to the net operating income. Colt Arms' counsel's post-trial submission states that Paterson's year 2024 tax rate is 5.095% and effective tax rate is 2.609%. Paterson did not dispute this effective tax rate in its post-trial submissions, nor did it offer any different calculation of the effective tax rate. Thus, the court accepts the effective tax rate promulgated by Colt Arms' counsel.

[8] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. In addition, "[r]elevant data is also collected and published by . . . [PwC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






To perform his band of investment technique Colt Arms' expert reviewed: (i) RealtyRates.com Hi-Rise/Urban Townhouse investor surveys for the 3rd quarter 2023; (ii) PwC (formerly known as Korpacz) investor surveys for the National Apartment Market for the 3rd quarter 2023; and (iii) Real Estate Research Corporation's ("RERC") investor survey data for First-Tier and Second-Tier Apartment Investment Properties for the 3rd quarter 2023. In addition, to discern his equity dividend rates, Colt Arms' expert reviewed RealtyRates.com All Types, Garden/Suburban TH Apartments, Hi-Rise/Urban TH Apartments and Student Housing Apartments investor surveys for the 3rd quarter 2023. During cross-examination, Colt Arms' expert testified that he principally relied on the RealtyRates.com and RERC Second-Tier Apartment Investment Properties tables in discerning his base capitalization rate.

Paterson's expert, in performing his band of investment technique, reviewed the American Council of Life Insurers ("ACLI") Investment Bulletin tables for apartments for the 3rd quarter 2023, to derive his mortgage interest rates, loan-to-value ratios, loan amortization terms, and equity dividend rates. In addition, Paterson's expert testified that he also reviewed capitalization rate investor survey data published by PwC (formerly known as Korpacz) for the National Apartment Market for the 3rd quarter 2023.

The following chart details the components of the experts' band of investment analysis and their derived band of investment base capitalization rates:

|  | Interest rate | Loan-to-value ratio | Amortization period | Equity dividend rate | Base capitalization rate |
|---|---|---|---|---|---|
| Colt Arms' expert | 6.50% | 80% | 30 years | 8.00% | 7.75%[9] |
| Paterson's expert | 4.90% | 60% | 30 years | 3.75% | 5.3%[10] |

After engaging in the band of investment technique and reviewing and analyzing the

---

[9] 80% LTV x 7.585% constant = 6.07% + 20% x 8.00% = 1.60%; 6.07% + 1.60% = 7.67%.
[10] 60% LTV x 6.37% constant = 3.822% + 40% x 3.75% = 1.50%; 3.822% + 1.50% = 5.322%.






investor survey data, Colt Arms' expert concluded that a base capitalization rate of 7% should be applied to the subject property's reconstructed net operating income in this matter. Similarly, after performing the band of investment technique and reviewing and analyzing the investor survey data, Paterson's expert concluded a base capitalization rate of 5.35% should be applied to the subject property's reconstructed net operating income in this matter.

At the outset, the court highlights that the 30-year loan amortization period employed by both experts under their band of investment techniques was identical. Based on the testimony and data elicited during trial, the court finds the 30-year amortization term to be reasonable and supported in the trial record. Therefore, the court accepts a 30-year amortization term under the band of investment technique.

However, as highlighted during trial, the RealtyRates.com data that was so integral to Colt Arms' expert's band of investment technique is not categorized by building size, number of units, geographical location, or building quality. Although there are minimum and maximum thresholds and averages, the data user does not know how many investors were surveyed, or where the surveyed transactions were located. Thus, the RealtyRates.com data could be based entirely on only a handful of transactions on the West Coast, in the Midwest, or in the Southeast. Notably, no information about the class or quality of the buildings being surveyed and whether they are in urban, rural or suburban settings is provided by RealtyRates.com. Therefore, although the court acknowledges that RealtyRates.com is a data source that is sometimes relied on by appraisers in forming their opinions of value, the court does not find that it offers the most reliable and relevant information on interest rates, loan-to value ratios, or equity dividend rates on age-restricted affordable housing apartment buildings, like the subject property, or in the subject property's market.






Moreover, the RERC and PwC investor survey data reflects a forecast of regional and institutional investors required or expected equity return on a 100% cash transaction.[11] Stated differently, "[t]he RERC and [PwC] Korpacz data is based upon all cash transactions." Hull Junction Holding Corp., 16 N.J. Tax at 102 (emphasis added). However, the band of investment technique employs both a mortgage financing component, and a cash equity investment component. Thus, as keenly observed by Judge Kuskin, "[w]here the cash investment, *i.e.,* the equity investment, is only 25%-30% of the total investment, the equity dividend rate would tend to be lower than the all[-]cash rate." Ibid. Accordingly, the court finds that the equity dividend and capitalization rates reflected in the RERC and PwC investor surveys are not necessarily an entirely accurate gauge of the equity dividend and capitalization rates that would be employed in a transaction that involves between 60% to 80% mortgage financing.

Additionally, the court emphasizes that RERC defines net operating income as the "current income of a property net of all operating expenses, but before any reserves, debt service, capital expenditures, tenant improvements and leasing commissions" (emphasis added).[12] Thus, in calculating the capitalization rates reported under the RERC investor surveys, a property's annual real estate taxes have been deducted from its gross income. However, it is a well-settled principle of New Jersey local property tax valuation that "[i]nclusion of real estate taxes as an operating expense is not permitted because the amount of real estate taxes are ultimately determined as a result of this court's finding of value . . . ." Spiegel v. Town of Harrison, 18 N.J. Tax 416, 427 (Tax 1999). In sum, the capitalization rates promulgated by RERC are not an entirely accurate representation of capitalization rates that would be employed in New Jersey Tax Court matters.

---

[11] https://rerc.com/img/sample-realestate.pdf.
[12] https://rerc.com/img/sample-realestate.pdf.






Finally, as Colt Arms's expert candidly acknowledged, the RERC and PwC investor surveys are "leased fee" valuations, a method of property valuation that is not accepted by the Tax Court.[13]  Thus, the data extracted from a hypothetical leased fee valuation of property is not necessarily probative of how the fee simple interest in a property would be arrived at, which this court is charged with doing.  Moreover, as Colt Arms' expert readily conceded, the investor "survey data is a little more difficult to rely upon," because Paterson's median household income is "substantially lower than anywhere in the State of New Jersey."  Colt Arms' expert further explained that because the anticipated annual rent increases in the subject property's affordable housing units are lower than traditional apartment complexes, the investor surveys may not be an accurate representation of the Paterson market.

Therefore, for the foregoing reasons, the court places little weight on the RERC and PwC investor surveys in determining the base capitalization rate that should be applied to the subject property's reconstructed net operating income.  Although the RERC and PwC investor surveys are a source of data available in the marketplace, the court does not find that they should be the principal source of data for discerning the equity dividend and capitalization rates for the subject

---

[13]  A leased fee approach values the "ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." Appraisal Institute, The Appraisal of Real Estate 72 (14th ed 2013).  The leased fee approach is materially influenced by the leasehold interest and the stream of rental income, it is often not a reliable indicator of true or fair market value. A "leased fee. . . [valuation is] of dubious usefulness. The remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors can affect the value . . . causing the sum to be less than or greater than the value of the fee simple estate." Id. at 505.  Because a leased fee approach does not always represent the value of the fee simple interest, this court has rejected conclusions of value premised upon the leased fee interest in property. Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 488 (Tax 2013), aff'd 28 N.J. Tax 568 (App. Div. 2015); Pine Plaza Associates, L.L.C. v. Hanover Twp., 16 N.J. Tax 194, 199 (Tax 1996); Harclay House v. East Orange City, 18 N.J. Tax 564 (Tax 2000); International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 423 (Tax 2004).






property. As stated in The Appraisal of Real Estate, when developing a capitalization rate, published surveys are an adequate source of "support rather than as primary evidence of a capitalization rate." The Appraisal of Real Estate 466 (14th ed 2013).

Rather, the court concludes, as did Paterson's expert, that the ACLI data provides the most meaningful data because it is not polluted or impacted by questions of whether it involves all cash transactions, or how potential survey recipients perceived hypothetical transactional questions. Although not perfect, the ACLI Bulletins provide national data on actual financing transactions, identifying the number of transactions in each category, the interest rates, the loan amortization periods, and the capitalization rates (thereby permitting the extraction of equity dividend rates), to enable the court to discern a capitalization rate for the subject property under the band of investment technique.

The court's review and analysis of the ACLI Investment Bulletins relied on by Paterson's expert reveals that, as of the October 1, 2023 valuation date, apartment loan interest rates ranged from 5.91% to 6.50%, loan-to-value ratios ranged from 55.92% to 58.82%, and capitalization rates ranged from 5.04% to 5.29%. According to Paterson's expert, the extracted equity dividend rates under the ACLI Bulletins in the "N.J.", "NY-NJ-CT-PA", "200-400 Units", "$15 - $24.99 million" dollar value, and greater than "$75,000/per unit" value categories ranged from 3.58% to 4.25%.

Although the court finds that ACLI Bulletins provide meaningful data for gauging the accuracy of the interest rates, loan-to-value ratios, and equity dividend rates employed by the experts under the band of investment technique, the court readily acknowledges that the transactions summarized therein are generally, institutional grade investments. However, the subject property is a rent controlled, age-restricted apartment building in an economically challenged urban area, and thus, does not fit within the parameters of an institutional grade






investment. As credibly testified by Colt Arms' expert, the subject property is a "better low-income" apartment building within the Paterson market, however, it is "not a premier asset type," and is in a "location already depressed from a rental perspective." Thus, the court finds that for the subject property, the interest rates and equity dividend rates would likely fall at or slightly beyond the upper limits of the range, and the loan-to-value ratio would likely fall at or below the lower limit of the range identified under the ACLI Bulletins.

Accordingly, based on the court's review of the ACLI Bulletins data, and in consideration of each expert's testimony, the court finds that as of the October 1, 2023 valuation date, Colts Arms' expert's 6.50% interest rate is most credible, Paterson's expert's 60% loan-to-value ratio is most credible, and a 5.25% equity dividend rate is most credible. The court emphasizes that it does not find either Colt Arms' expert's 8% equity dividend rate, or Paterson's expert's 3.75% equity dividend rates to be reasonable. The data from the ACLI Bulletins revealed that equity dividend rates for institutional grade apartment properties ranged from 3.58% to 4.25%. The subject property is a rent and age-restricted multi-family apartment building, not an institutional grade property. Thus, the equity dividend rates should exceed those promulgated under ACLI Bulletins. However, the court does not find that the equity dividend rates should be approximately twice that of the ACLI Bulletins extracted equity dividend rates.

Therefore, the court concludes that as of the October 1, 2023 valuation date, the base capitalization rate that should be applied to the subject property's reconstructed net operating income is 6.651%.[14] The court will add Paterson's effective tax rate of 2.609% (5.095% general tax rate x 51.20% avg. ratio = 2.6086%) to the 6.651% base capitalization rate for an overall or

---

[14] 7.585% constant x .60 = 4.551% and 5.25% x .40 = 2.1% (4.551% + 2.1% = 6.651%).






loaded capitalization rate of 9.26%.

Accordingly, the reconstructed operating statement for the subject property for the 2024 tax year, based on the stipulations of Colt Arms and Paterson, is set forth below:

**2024 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| POTENTIAL GROSS INCOME | | $ 3,410,000 |
| LESS: Vacancy & Collection Loss | @ 2.75% | ($ 93,775) |
| | | $ 3,316,225 |
| PLUS: Other Income | | $ 11,500 |
| TOTAL: EFFECTIVE GROSS INCOME | | $ 3,327,725 |

EXPENSES:

| | |
|---|---|
| Stabilized Expenses | ($ 1,507,200) |

NET OPERATING INCOME      $ 1,820,525

| | |
|---|---|
| Base capitalization rate | 6.651% |
| Effective tax rate | 2.609% |
| Loaded capitalization rate | 9.26% |

MARKET VALUE      $19,660,097

Therefore, the court finds the rounded true or market value of the subject property to be $19,660,100, as of the October 1, 2023 valuation date.

2.    Corrected Local Property Tax Assessment

Having reached a conclusion of the subject property's true or fair market value, the court will turn its attention to determining the subject property's correct tax assessment for the 2024 tax year.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This






process involves application of the Chapter 123 common level range.  N.J.S.A. 54:1-35a(b).

The ratio of assessed value, $13,570,000, to true market value, $19,660,100, yields a ratio of 69.02% ($13,570,000/$19,660,100 = 69.02%), which exceeds Paterson's upper limit (58.88%) of the Chapter 123 common level range.  Consequently, the subject property's tax assessment for the 2024 tax year is:

$$\$19,660,100 \ \ x \ \ .5120 = \quad \$10,066,000 \ [ROUNDED]$$

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2024 will be entered as follows:

| | |
|---|---|
| Land | $ 2,070,000 |
| Improvement | $ 7,996,000 |
| Total | $10,066,000 |

Accordingly, contemporaneous herewith the court shall enter judgment reducing the subject property's 2024 local property tax assessment as set forth above.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




